APPEAL CASE NOS. 13-56243, 13-56244
CROSS-APPEAL CASE NOS. 13-56257, 13-56259

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

LAURA SIEGEL LARSON

*Plaintiff, Counterclaim-Defendant, Appellant and Cross-Appellee,*

v.

WARNER BROS. ENTERTAINMENT INC., DC COMICS

*Defendants, Counterclaimants, Appellees and Cross-Appellants.*

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
THE HONORABLE OTIS D. WRIGHT II, JUDGE
CASE NOS. CV-04-8400 ODW (RZx), CV-04-8776 (RZx)

_____

**APPELLANT LAURA SIEGEL LARSON'S THIRD BRIEF
ON CROSS-APPEAL**

_____

TOBEROFF & ASSOCIATES, P.C.
Marc Toberoff
  *mtoberoff@ipwla.com*
Keith G. Adams
  *kadams@toberoffandassociates.com*
22337 Pacific Coast Highway, #348
Malibu, CA 90265
Telephone:  (310) 246-3333
Facsimile:  (310) 246-3101

*Attorneys for Plaintiff-Appellant,Laura
Siegel Larson, individually and as personal
representative of the Estate of Joanne Siegel*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................1

SUMMARY OF ARGUMENT ...........................................................................3

ARGUMENT ......................................................................................................6

    I.    THE OCTOBER 19, 2001 LETTER DID NOT
        CONTAIN A PRESENT COPYRIGHT ASSIGNMENT...................6

        A.    This Court Did Not and Should Not Hold that the
               Language "The Siegel Family Would Transfer"
               Constitutes a Present Assignment ....................................6

        B.    "The Siegel Family Would Transfer" Cannot be
               Construed as a Present Assignment, Particularly on
               Summary Judgment .......................................................11

               1.    DC's Recharacterization of the October 19
                      Letter Is Unavailing .........................................11

               2.    DC Cannot Convert a Contingent Promise
                      into an Actual Assignment ...............................14

               3.    DC's "Power-of-Attorney" Argument Is
                      Waived and Unpersuasive ...............................17

    II.    LARSON AT NO TIME WAIVED HER IMPLICIT
        RESCISSION REMEDY OR HER EXPRESSLY PLED
        ACQUIESCENCE DEFENSE........................................................19

        A.    Larson Properly Asserted Rescission and
               Acquiescence on Remand .......................................19

        B.    The Siegels' Rescission and DC's Acquiescence
               Were Also Implicit in the Facts, Pleading and
               Discovery ..................................................................20

        C.    DC Cannot Refute that Rescission Is a Remedy
               Preserved by Larson .................................................23

        D.    Affirmative Defenses May Be Raised for the First
               Time on Summary Judgment Absent
               Demonstrable Prejudice ...........................................24

i

III.  DC'S ARGUMENTS REGARDING RESCISSION AND
      ACQUIESCENCE ARE MERITLESS ............................................... 26

      A.    The Rescission Ruling Was Wrong ......................................... 27

            1.    No Requirement That Rescinding Party
                  Acknowledge an Enforceable Contract ......................... 27

            2.    DC's Anticipatory and Actual Breaches of the
                  2001 Letter Were Ample Grounds for
                  Rescission ..................................................................... 28

      B.    The Court Erred in Dismissing Larson's
            Acquiescence Defense ............................................................. 30

IV.   THE DISTRICT COURT'S HOLDING THAT THE 2001
      LETTER ANTICIPATORILY TRANSFERRED LARSON'S
      UNVESTED TERMINATION INTEREST
      IN SUPERBOY AND THE ADS CONTRAVENES THE
      STATUTE ................................................................................... 32

      A.    The Copyright Act Prohibits The Anticipatory
            Assignment or Waiver of Future Termination
            Interests .................................................................................. 33

      B.    No Court Has Permitted the Waiver or Anticipatory
            Assignment of Future Termination Interests
            Because Both Contravene the Statute ..................................... 35

      C.    DC's Argument that the 2001 Letter Revoked
            Siegel's 1938 and 1948 Grants Is Frivolous ........................... 40

      D.    DC's Arguments that Superboy and the Ads Were
            Works-For-Hire Are Procedurally Improper ........................... 45

            1.    DC Waived These Arguments,
                  Not Raised in its 2013 Motion .................................... 45

            2.    DC Likewise Waived Arguments by
                  Not Raising Them in *Larson I* ..................................... 46

            3.    The Superboy Case's Merits Are
                  Not on Appeal .............................................................. 46

      E.    DC's Work-For-Hire Arguments Are Meritless
            and, At Best, Raise Issues for the Trier-of-Fact ..................... 47

1. The *AC#1* Cover Copied in the Ads is Not Work-For-Hire ................................................. 47

2. Siegel's Superboy Was Protected and Not DC's "Work-For-Hire" ................................. 47

DC's CROSS-APPEAL ON LARSON'S FIRST CLAIM AND DC'S SECOND COUNTERCLAIM ................................................. 49

I. *LARSON I* DID NOT TIME-BAR PLAINTIFF'S CLAIMS ................................................................. 49

    A. DC Waived Its SOL Argument Based on *Larson I* by Failing to Raise It on Remand ..................... 49

    B. DC Did Not Follow the Notice Procedures in the Tolling Agreement It Now Relies On ................. 50

    C. The 2001 Letter Did Not "Amicabl[y]" Resolve "The Disputes" ............................................ 51

    D. DC's Argument, At Most, Presents Issues for the Trier-of-Fact ........................................... 53

    E. The Superboy Case And Ads Terminations Are Not Time-Barred ......................................... 53

    F. Strong Policies Disfaor Using § 507(b) to Bar Statutory Termination .................................. 53

II. NEITHER *LARSON I* NOR DC's FOURTH COUNTERCLAIM BAR JUDGMENT ON LARSON'S FIRST CLAIM ................................................................. 54

    A. *Larson I* Did Not Concern the First Claim ............... 54

    B. DC's Fourth Counterclaim Is Pled "In The Alternative" *If* the First Claim Is Granted ................. 55

    C. The First Claim Is Not Mooted by DC's Fourth Counterclaim…. ........................................... 56

III. DC'S WORK-FOR-HIRE ARGUMENTS ARE MERITLESS ................................................................. 59

A.    *Action Comics, No. 1 ("AC#1") Is Not Work-For-Hire* ..............................................................59

    1.    DC Is Precluded From Arguing That Bits of *AC#1* Are Work-For-Hire................................59

    2.    Alleged Additions to *AC#1* Were Not "Work-For-Hire"… ......................................61

        a.    Siegel/Shuster's 1938 Material ............................61

        b.    Colorization ...................................................62

        c.    Cover Art .......................................................62

        d.    DC Is Not a Joint-Author ..................................63

B.    *AC#4* and *Superman#1* Are Not Works-For-Hire ...................63

    1.    Superman#1 .........................................................64

    2.    AC#4 ....................................................................64

C.    Larson Recaptured the First Two-Weeks of Newspaper Strips Created "On Spec" ......................................64

    1.    Not Work-For-Hire................................................64

    2.    DC Was Clearly On Notice .........................................66

CONCLUSION .......................................................................67

iv

# TABLE OF AUTHORITIES

## CASES

*Aalmuhammed v. Lee*,
   202 F.3d 1227 (9th Cir. 2000) ...................................................................54, 63

*Abraxis Bioscience, Inc. v. Navinta LLC*,
   625 F.3d (Fed. Cir. 2010)...................................................................16

*Ahmad v. Furlong*,
   435 F.3d 1196 (10th Cir. 2006) ...................................................................24

*Albino v. Baca*,
   747 F.3d 1162 (9th Cir. 2014) ...................................................................26

*Am. Title Ins. Co. v. Lacelaw Corp.*,
   861 F.2d 224 (9th Cir. 1988) ...................................................................40

*Alexander v. Angel*,
   37 Cal. 2d 856 (1951) ...................................................................43, 44

*Arachnid, Inc. v. Merit Industries, Inc.*,
   939 F.2d 1574 (Fed. Cir. 1991)...................................................................16

*Ball Corp. v. Xidex Corp.*,
   967 F.2d 1440 (10th Cir. 1992) ...................................................................25

*Bass v. Olson*,
   378 F.2d 818 (9th Cir. 1967) ...................................................................17

*Bd. of Trustees. v. Roche Molecular Sys., Inc.*,
   583 F.3d 832 (Fed. Cir. 2009) *aff'd* at 131 S. Ct. 2188 (2011) ...........................16

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
   491 F.Supp 1320 (S.D.N.Y. 1980) ...................................................................67

*Burroughs v. Metro-Goldwyn-Mayer, Inc.*,
   683 F.2d 610 (2d Cir. 1982)...................................................................65, 67

*Cedars-Sinai Med. Ctr. v. Shalala*,
   177 F.3d 1126 (9th Cir. 1999) ...................................................................24

*Chartis Specialty Ins. Co. v. Aqua Sciences Engineers, Inc.*,
   2013 WL 4647288 (N.D. Cal. 2013) ...................................................................43

*Classic Media, Inc. v. Mewborn*,
   532 F.3d 978 (9th Cir. 2008) ...................................................................36, 41

*Coleman v. Quaker Oats Co.*,
   232 F.3d 1271 (9th Cir. 2000) ...................................................................26

*Davies Mach. Co. v. Pine Mountain Club, Inc.*,
   39 Cal. App. 3d 18 (Ct. App. 1974) ................................................... 43

*DC Comics v. Pac. Pictures Corp.*,
   545 F.App'x 678 (9th Cir. 2013) ......................................................... 35

*Disimone v. Browner*,
   121 F.3d 1262 (9th Cir. 1997) ............................................................ 58

*Donovan v. RRL Corp.*,
   26 Cal. 4th 261 (2001) ................................................................. 27, 28

*Dream Games of Arizona Inc., v. PC Onsite*,
   561 F.3d 983 (9th Cir. 2009) .............................................................. 34

*Estate of Burne Hogarth v. Edgar Rice Burroughs*,
   342 F.3d 149 (2d Cir. 1966) ............................................................... 65

*Fanucchi & Limi Farms v. United Agri Products*,
   414 F.3d 1075 (9th Cir. 2005) ............................................................ 42

*Fields v. City of Oakland*,
   137 Cal. App. 2d 602 (1955) .............................................................. 11

*Frankel v. Bd. of Dental Examiners*,
   46 Cal. App. 4th 534 (1996) .............................................................. 43

*Gilleland v. Schanhals*,
   55 F. App'x 257 (6th Cir. 2003) ......................................................... 15

*Grunwald-Marx, Inc. v. Los Angeles Joint Board,
Amalgamated Clothing Workers*,
   192 Cal. App. 2d 268 (1961) .............................................................. 31

*Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*,
   531 F.3d 767 (9th Cir. 2008) .............................................................. 51

*Hillis v. Heineman*,
   626 F.3d 1014 (9th Cir. 2010) ............................................................ 50

*Honda v. Reed*,
   156 Cal. App. 2d 536 (1958) .............................................................. 31

*Houglet  v. Barra Inc.*,
   9 F.3d 1551 (1993) ........................................................................... 50

*Howard v. County of Amador*,
   220 Cal. App. 3d 962 (1990) .............................................................. 42

*In re Lopez*,
   274 B.R. 854 (B.A.P. 9th Cir. 2002) *aff'd*, 345 F.3d 701 (9th Cir. 2003) ........... 23

*In re Lopez*,
   345 F.3d 701 (9th Cir. 2003) .............................................................. 21

*In re Nat'l Lumber & Supply, Inc.*,
  184 B.R. 74 (B.A.P. 9th Cir. 1995) .................................................. 25

*In re Palmdale Hills Prop., Inc.*,
  2012 WL 4791132 (C.D. Cal. 2012) ................................................ 43

*In re Peregrine Entm't, Ltd.*,
  116 B.R. 194 (C.D. Cal. 1990) ........................................................ 11

*In re Rains*,
  428 F.3d 893 (9th Cir. 2005) ........................................................... 18

*IpVenture, Inc. v. ProStar Computer, Inc.*,
  503 F.3d 1324 (Fed. Cir. 2007) ....................................................... 16

*Jay v. Dollarhide*,
  3 Cal. App. 3d 1001 (1970) ............................................................. 19

*Johnson v. Goldberg*,
  130 Cal. App. 2d 571 (1955) ........................................................... 29

*Johnson v. Wells Fargo Home Mortgage, Inc.*,
  635 F.3d 401 (9th Cir. 2011) ........................................................... 26

*Kamilche Co. v. United States*,
  53 F.3d 1059 (9th Cir. 1995) ........................................................... 60

*Kesselring v. F/T Arctic Hero*,
  95 F.3d 23 (9th Cir. 1996) ............................................................... 46

*Kirtsaeng v. John Wiley & Sons, Inc.*,
  133 S. Ct. 1351 (2013) .................................................................... 39

*Magana v. Commonwealth of Northern Mariana Islands*,
  107 F.3d 1436 (9th Cir.1997) .......................................................... 24

*Marvel Characters, Inc. v. Simon*,
  310 F.3d 280 (2d Cir. 2002) ............................................................ 37

*McCreary v. Mercury Lumber Distributors*,
  124 Cal.App.2d 477 (1957) ............................................................. 31

*Mendoza v. Wilmington Finance*,
  2011 WL 2182914 (N.D. Cal. 2011) ............................................... 23

*Mills Music, Inc. v. Snyder*,
  469 U.S. 153 (1985) .................................................................... 39, 53

*Milne ex rel. Coyne v. Stephen Slesinger, Inc.*,
  430 F.3d 1036 (9th Cir. 2005) .................................................*passim*

*Morrison v. Mahoney*,
  399 F.3d 1042 (9th Cir. 2005) ......................................................... 20

*Munoz v. Imperial Cnty.*,
   667 F.2d 811 (9th Cir. 1982) ....................................................46

*Music Sales Corp. v. Morris*,
   73 F. Supp.2d 364 (S.D.N.Y. 1999) ...................................66

*N.Y. Times v. Tasini*,
   533 U.S. 483 (2001) .............................................................39

*Olympic Fin. Co. v. Thyret*,
   337 F.2d 62 (9th Cir. 1964) ...............................................44

*Paulo v. Holder*,
   669 F.3d 911 (9th Cir. 2011) .............................................60

*Penguin Grp. (USA) Inc. v. Steinbeck*,
   537 F.3d 193 (2d Cir. 2008) .............................35, 37, 38

*Pennel v. Pond Union Sch. Dist.*,
   29 Cal. App. 3d 832 (Ct. App. 1973) ...............................43

*People ex rel. Kennedy*,
   111 Cal. App. 4th 102 (2003) ...........................................27

*Peterson v. Kolodin*,
   2014 WL 502983 (S.D.N.Y. 2014) ...................................15

*Picture Music, Inc. v. Bourne Inc.*,
   457 F.2d 1213 (2d Cir. 2014) ...........................................65

*Pirelli Armstrong Tire Corp. Retiree*
*Med Benefits Trust v. Walgreen Co.*,
   631 F.3d 436 (7th Cir. 2011) .............................................56

*Playboy Enters. v. Dumas*,
   53 F.3d 549 (2d Cir. 1995) ................................................60

*Radio Television Espanola S.A. v. New World Entm't, Ltd.*,
   183 F.3d 922 (9th Cir. 1999) .............................................14

*Rano v. Sipa Press, Inc.*,
   987 F.2d 580 (9th Cir. 1993) .............................................57

*Regus Mgmt. Group, LLC v. I.B.M. Corp.*,
   2008 WL 1836360 (N.D. Tex. 2008) .................................24

*Runyan v. Pac. Air Indus.*,
   2 Cal.3d 304 (1970) ...........................................................21

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
   969 F.2d 410 (7th Cir. 1992) .............................................15

*Schrock v. Learning Curve Int'l, Inc.*,
   586 F.3d 513 (7th Cir. 2009) .............................................65

*SGA, Inc. v. Banks Shippam, Ltd.*,
　2002 WL 1897991 (Cal. Ct. App. 2002) ...................................42

*Siegel v. National Periodical Publications, Inc.*,
　508 F.2d 909 (2d Cir. 1974).......................................................59

*Simmons v. Navajo County*,
　609 F.3d 1011 (9th Cir. 2010) ...................................................22

*Simmons v. Sweeney*,
　13 Cal. App. 283 (Cal. Ct. App. 1910) .....................................44

*Snow-Erlin v. United States*,
　470 F.3d 804 (9th Cir. 2006) .......................................................7

*Solis v. Washington*,
　656 F.3d 1079 (9th Cir. 2011) ...................................................26

*Speedplay, Inc. v. Bebop, Inc.*,
　211 F.3d 1245 (Fed. Cir. 2000)...................................................16

*Stewart v. Abend*,
　495 U.S. 207 (1990)...............................................................39, 66

*Swarner v. United States*,
　937 F.2d 1478 (9th Cir. 1991) ...................................................26

*Thomas v. Ponder*,
　611 F.3d 1144 (9th Cir. 2010) ...................................................53

*Trent v. Valley Elec. Ass'n, Inc.*,
　195 F.3d 534 (9th Cir. 1999) .....................................................58

*Twentieth Century Fox Film Corp. v. Entm't Distributing*,
　429 F.3d 869 (9th Cir. 2005) .....................................................60

*U.S. Fire Ins. Co. v. Williamsburg Nat. Ins. Co.*,
　2008 WL 5054107 (E.D.Cal. 2008)...........................................26

*U.S. for Use of Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*,
　498 F.2d 335 (9th Cir. 1974)......................................................29

*United States v. Anekwu*,
　695 F.3d 967 (9th Cir. 2012) ...............................................34, 45

*United States v. Bajakajian*,
　84 F.3d 334 (9th Cir. 1996) .......................................................47

*United States v. Bentson*,
　947 F.2d 1353 (9th Cir. 1991) ...................................................40

*United States v. Kales*,
　314 U.S. 186 (1941)....................................................................15

ix

*United States v. Woods*,
  134 S. Ct. 557 (2013) ........................................................37

*Valente-Kritzer Video v. Callan-Pickney*,
  881 F.2d 772 (9th Cir. 1989) .............................................12

*Vincent v. Trend W. Technical Corp.*,
  828 F.2d 563 (9th Cir. 1987) .............................................46

*Wang Zong Xiao v. Reno*,
  837 F. Supp. 1506 (N.D. Cal. 1993) ..................................55

*Weber v. Dep't of Veterans Affairs*,
  521 F.3d 1061 (9th Cir. 2008) ...........................................18

*Westinghouse Elec. Corp. v. General Circuit Breaker
& Elec. Supply, Inc.*,
  106 F.3d 894 (9th Cir. 1997) .............................................60

*Williams v. Reed*,
  113 Cal. App. 2d 195 (Cal. Ct. App. 1952) .......................44

*Wilson v. Lewis*,
  106 Cal. App. 3d 802 (1980) .............................................22

*Zarate v. Bruker Nano, Inc.*,
  2013 WL 1247929 (Cal. Ct. App. 2013) ............................44

*Zuill v. Shanahan*,
  80 F.3d 1366 (9th Cir. 1996).............................................54

## STATUTES

17 U.S.C. § 203. ...................................................... 37, 38

17 U.S.C. § 204(a). ................................................. 8, 9, 10

17 U.S.C. § 304 ...................................................... *passim*

17 U.S.C. § 507(b) .................................................. 53, 54

Cal. Civ. Code § 1473 ...................................................43

Cal. Civ. Code § 1530 ...................................................42

Cal. Civ. Code § 1638.....................................................7

Cal. Civ. Code § 1689(b) ...............................................27

Cal. Civ. Code § 2356(a)(1) ...........................................19

x

## RULES

Fed. R. Civ. P. 56 ........................................................................... 19, 32

## REGULATIONS

37 C.F.R § 201.10 .................................................................................66

## OTHER AUTHORITIES

1 Melville B. Nimmer & David Nimmer,
   Nimmer on Copyright § 5.03 (2011) .......................................47, 57, 66

1 Melville B. Nimmer & David Nimmer,
   Nimmer on Copyright § 6.03 (2011) .................................................64

74 F.R. 12554-01 (2009) .......................................................................66

H.R. Rep. No. 94-1476, 94th Cong., 2d Sess. (1976)...................................*passim*

S. Rep. No. 94-473, 94th Cong., 1st Sess. (1975) ...................................36

## <u>INTRODUCTION</u>

Defendants' story is falling apart.  The more they succeed in re-writing history, the worse it gets.  Defendants' narrative is loaded with contradictions of its own pleadings and prior representations to the court—a house-of-cards built with sleight-of-hand—making no legal or practical sense.

For over three years, defendants ("DC") never asserted any contract when one naturally would.  After plaintiff filed suit, DC pled a contract among multiple "alternative" counterclaims.  It alleged this was "memorialized" in an October 19, 2001 letter ("October 19 Letter") *and* DC's October 26, 2001 response ("October 26 Letter").  After losing based on their material differences, DC back-peddled telling this Court "only the October 19 terms control" and managed to garner a partial reversal.

This inevitably led to problems.  The October 19 Letter says what the Siegels "would" do (e.g., they "would agree to…"; they "would warrant," they "would transfer" their rights, etc.) as both sides naturally contemplated a regular contract, given Superman's enormous value.

On remand, DC's story began to unravel, and in this appeal, it implodes. DC insisted and the district court held that the October 19 Letter was *a present copyright assignment* contrary to its plain language.  But the Letter called for DC to pay $3 million *upfront* plus an accounting, which DC failed to do for *six-and-*

1

*one-half* months *before* receiving the Siegels' May 9, 2001 letter ("May 9 Letter") it blames.

In the *Larson I* appeal, DC said this letter "acknowledged" their "agreement" and repudiated it. On remand DC claimed no notice of rescission because the letter "did not acknowledge an agreement," and the court so held without basis in law or fact.

DC successfully argued in 2007 that the Siegels' 1997 termination excluded *all* works outside its statutory 1938-1943 window. Now it says the 1997 notices included Superboy—first published in 1944. To circumvent Larson's 2002/2012 terminations regarding Superboy/the Ads, DC claims the October 19 Letter silently revoked Jerome Siegel's pre-1978 grants, when in 2011 DC pled these grants "were still in effect." The district court, of course, found no revocation; but at DC's urging, held that the 2001 letter assigned copyrights recaptured by *subsequent* terminations—contrary to Section 304(c)(6)(D).

After promoting this legal quagmire—on the verge of collapse—DC proclaims this has all gone on too long, as if that were the measure of Larson's legal rights and remedies. DC touts "nine appeals" when this is Larson's second in the Superman case and *first* in the Superboy case. DC lards its brief with jury arguments, referring to Larson's "millions," when this has always been about

defendants keeping as much of their multi-billion-dollar gold-mine as possible, even if it means short-changing copyright law and Superman's creators.[1]

Larson urges this Court to take a more in-depth view and re-establish order in these cases by rendering DC accountable, respecting her copyrights, enforcing summary judgment standards, and ensuring that her contract remedies/defenses are properly tried.

## SUMMARY OF ARGUMENT

**I.     Ownership.** DC's argument that the October 19 Letter's phrase— "[t]he Siegel Family would transfer" their rights—constituted an actual present assignment is frivolous. The district court erred in speculating that *Larson I* found this, on summary judgment no less, contrary to the Letter's plain language. *Larson I* did not construe contractual terms in the first instance, nor was this before the Court. Instead, it duly remanded for adjudication of DC's contract counterclaims. DC waived its "power-of-attorney" argument by raising it for the first time in its reply brief below. In any event the language "would be appointed as attorney-in-fact" suffers from the same infirmity.

**II.     Superboy/Superman Ads.** The district court also erred in ruling that the October 19, 2001 letter anticipatorily assigned the Superboy and Superman Ads copyrights later recaptured by Larson's 2002 and 2012 termination notices, as

---

[1] In reality, defendants seek to restrict Larson to .3 of 1% of *Warner Bros*.' defined Superman revenues, and Hollywood accounting. ER-597-601.

this contravenes 17 U.S.C. §304(c)(6)(D) (omitted by DC).  Larson also could not

have waived her subsequent termination rights.  *Id.*, §304(c)(5); H.R. Rep. No. 94-

1476, at 125 (1976).  DC's scattered irrelevant arguments cannot change these

preemptive statutory prohibitions.  DC's argument that the Letter silently revoked

Jerome Siegel's pre-1978 grants was duly rejected by the court and is contrary to

all the evidence.  Accordingly, DC and the court's reliance on *Milne v. Stephen

Slesinger, Inc.*, 430 F.3d 1036 (9th Cir. 2005) and its progeny is misplaced.

DC waived its arguments that Superboy/Ads were works-for-hire by not

rasing them in its *Larson I* cross-appeal on the First Claim, or on remand.  DC

argues the merits of the entire Superboy case which are not part of either cross-

appeal or for decision in the first instance.

**III.   Current Enforceability.**  After acknowledging that "subsequent

events may have affected the present enforceability of that [10/19/01] contract, as

by a material breach followed by an effective rescission" (ER-28), the district court

erred by summarily disposing of Larson's rescission remedy and acquiescence

defense.  The court ruled, contrary to California law, that Larson had no rescission

remedy because the May 9 Letter purportedly did not acknowledge a contract.  DC

still cannot cite a single case for this erroneous proposition.  The court similarly

erred in deciding the factual question of whether DC acquiesced in Larson's

repudiation/rescission, construing everything in the light most favorable to the

4

movant-DC.  At a minimum, rescission and acquiescence are for the trier-of-fact.

Larson never waived her rescission remedy or expressly pled acquiescence defense.  Larson asserted both at the appropriate juncture on remand.  Previously there was no need, as the district court found no contract.  DC cannot refute that rescission is a remedy, preserved by Larson's Answer.  On remand the court decided these issues on the merits, finding no waiver.  It is well-settled that even affirmative defenses may be raised for the first time on summary judgment absent real prejudice.  And DC made no showing below of prejudice whatsoever.  DC can hardly claim surprise when acquiescnese was pled as an affirmative defense, and rescission was implicit in the facts, pleading, and DC's extensive discovery regarding the May 9 Letter.

### DC's Cross-Appeal

**I**.    **Statute of Limitations ("SOL")**. The district court correctly held that plaintiff's claims were timely filed due to the parties' Tolling Agreement.  On appeal, DC frivolously argues that it cancelled the Tolling Agreement because the October 19 Letter "amicably resolved all disputes," citing *Larson I*.  First, *Larson I* never held this.  Second, DC waived this argument by not raising it on remand when Larson moved regarding DC's SOL defense.  Third, the Tolling Agreement required formal cancellation notice which DC never served.  Fourth, the Tolling Agreement was expressly made to promote settlement negotiations, which

continued long after the Letter precisely because it did not resolve the parties' multi-faceted disputes.

**II**.    **First Claim Is Not Moot**.  Neither *Larson I* nor DC's Fourth Counterclaim bars judgment on Larson's First Claim regarding the validity of her 1997 terminations.  *Larson I* did not concern or reverse the judgment on Larson's First Claim which is "law of the case." DC's Fourth Counterclaim did not moot this; DC pled "in the alternative" *if* this were granted.  *Larson I*'s passing comment about potential mootness from a yet-to-be-rendered declaratory judgment was not an adjudication on the merits.  The First Claim is also not moot because the October 19 Letter is subject to rescission for past or future breaches by DC.

**III.    Not Work-for-Hire**.  The district court correctly held that DC was precluded by a 1974 decision from arguing that reformatting additions to *AC#1* were work-for-hire, *and* debunked this by careful analysis of the record.

## ARGUMENT

## I.    THE OCTOBER 19, 2001 LETTER DID NOT CONTAIN A PRESENT COPYRIGHT ASSIGNMENT

### A.    This Court Did Not and Should Not Hold that the Language "The Siegel Family Would Transfer" Constitutes a Present Assignment

DC's primary argument rests on the fiction that this Circuit decided that the October 19 Letter's phrase, "[t]he Siegel Family *would* transfer," constituted an actual present assignment of their valuable Superman copyrights as a matter of

6

law.  This Court reviews the scope of its prior mandate de novo.  *Snow-Erlin v. United States*, 470 F.3d 804, 807 (9th Cir. 2006).

The district court did not adjudicate contractual terms or this issue because it found no contract.  *Larson I* thus concerned contract formation, not contract construction.  The Court did not purport to construe contractual terms, and it is unreasonable to infer that it would decide the parties' intent, in the first instance *and* on summary judgment, contrary to the Letter's plain language.  Cal. Civ. Code §1638 ("The language of a contract is to govern its interpretation[.]").  Instead, the Court duly remanded for adjudication of DC's contract counterclaims.  ER-274-77.

DC misleadingly quotes the opinion out of context to falsely insinuate that the transfer issue was being appealed.  SB-20.  But in 115 pages of appellate briefing, DC never argued that "would transfer" constituted a present assignment.  ER-762-797, 1447-1505.

Larson argued on appeal that no contract was reached because (1) there was no "meeting of the minds" as objectively shown by the materially different terms in the parties contemporaneous exchanges, and (2) it was understood, given Superman's enormous value, that any agreement would take the form of a standard signed contract, not a mere attorney's letter outlining discussions.  ER-1087-89.

DC argued that no formal documentation was required, even suggesting an alleged oral agreement on October 16.  SER-1188-89 (citing three articles

regarding *"Oral Contracts in the Entertainment Industry,"* *"Oral and Unsigned Film Agreements,"* and *"Handshake Deals."*).

In response, and to bolster her argument that a traditional contract was intended, Larson argued "a written contract was required as a matter of law. 17 U.S.C. § 204(a)," and stated DC "argues…a purported 'handshake' is sufficient and relies…on secondary sources that nonetheless flag § 204(a)'s writing requirement[.]" ER-1088-89.

To demonstrate the parties never intended the agreement be oral or an attorney's letter, Larson pointed to DC's October 26 Letter ("by the time you have [returned] we will have this super-matter transaction in document form."). ER-1090. In other words, DC's February 1 Draft was its proposed agreement, not a mere "long-form" as now styled by DC. ER-1177, SB-10. Larson also pointed to Section 204(a) and the future tense of "would transfer" to show a written contract was contemplated, not attorney correspondence.

The Court focused on the contract *formation* issue on appeal. The relevant paragraph opens by rejecting that "state or federal law precludes" finding that "a contract could have been created by the October 19, 2001, letter", and holds:

> [U]nder California's statute of frauds, the only signature that is required is that of the party against whom a contract is sought to be enforced. Nor is *17 U.S.C. § 204(a)* a bar to the validity of any such contract; that statute expressly permits an agreement transferring ownership of a copyright to be signed by a "duly authorized agent" of the copyright owner, and Larson does not contest that the heirs' attorney was such an agent.

ER-276 (citations omitted).

It is clear that the Court was addressing that the Letter was not signed *by the parties*. The Court nowhere purported to construe the language "[t]he Siegel Family would transfer" as a present copyright assignment as this was neither adjudicated below nor on appeal. The brief reference could equally be read to mean that because Section 204(a) "permits an agreement transferring ownership of a copyright to be signed by a 'duly authorized agent'" it does not bar the Letter's promise to do so. Alternatively, the Court simply did not focus on the Letter's "would transfer" language as there was no reason to. Either way, its mere use of the word "transferring" as short-hand *in describing Section 204(a)* was not a substantive adjudication, in the first instance and on summary judgment, that the Siegels intended to assign their valuable copyrights on October 19, contrary to the Letter's plain language. *See United States v. Johnson*, 256 F.3d 895, 915 (9th Cir. 2001) ("Of course, not every statement of law in every opinion is binding on later panels," particularly "where the statement is uttered in passing".).

On remand, the district court found:

> [T]he language of the October 19 agreement plainly supports the Siegels' contention that the agreement itself did *not* operate to transfer the Siegels' Superman rights to DC Comics. The plain language of the agreement—"The Siegel Family *would* transfer all of its rights"—suggests that the transfer wasn't immediately operative.

ER-35. It nonetheless held based on "a somewhat perplexing aspect of the Ninth

Circuit's mandate," that it impliedly found "would transfer" constituted a present assignment because "there would have been no need to raise §204(a) at all." ER-36. Such speculation is insufficient to outweigh the Letter's plain language on summary judgment. Nor should such an unreasonable holding be inferred.

The Circuit had remanded for adjudication of DC's Fourth Counterclaim, which alleges that the Siegels "either transferred or are contractually obligated to transfer" their copyrights. ER-350 ¶103(a). Had it found a present assignment, this would have decided DC's counterclaim already. "Indeed, had the Circuit thought its ruling on the October 19, 2001 Letter disposed of DC's counterclaims, it would have said so[]." ER-27. Instead, the panel remanded "to reconsider DC's third and fourth counterclaims in light of [its] holding" that a contract was formed (ER-276-77).

DC's retort that remand "was to let DC seek summary judgment, a step it had not formally taken" (SB-23) is nonsensical because DC never moved for summary judgment on contract formation which the Court decided.

This Circuit also never "directed the district court to address…that recognizing…the 2001 Agreement would dispose of all claims in the case." SB-23. It stated that because "a judgment on [the Third/Fourth Counterclaims] in DC's favor *would* appear to render moot…other questions…we decline to address these…*at this time*." ER-277 (emphasis added). The Court's statement would be

absurd had it already decided the Fourth Counterclaim, i.e., that the Siegels "transferred" their copyrights. ER-350-51.

To amplify its illusion that the opinion found a present assignment, DC quotes a "background" snippet (the "continued right to produce Superman works" (ER-275) and argues this "required a transfer." SB-22-3. But, as DC knows, Superman is a joint work and Larson's recapture of Siegel's co-authorship interest left DC *free to exploit Superman* subject to her fair share of profits from new Superman works following her 1999 termination. ER-251-57, 3293 n.15.

### B. "The Siegel Family Would Transfer" Cannot Be Construed as a Present Assignment, Particularly on Summary Judgment

#### 1. DC's Recharacterization of the October 19 Letter Is Unavailing

DC weaves bits from its electronic files to argue the Siegels somehow assigned to DC their copyrights on October 19. None of it is persuasive. Try as it might, DC cannot convert the plain language, "would transfer," at best a contingent promise to assign, into a present assignment. "The language is not that of a present transfer but only a promise to do so in the future." *Fields v. City of Oakland*, 137 Cal.App.2d 602, 609 (1955). *See In re Peregrine Entm't, Ltd.*, 116 B.R. 194, 204 (C.D. Cal. 1990)("mere agreement to assign mark in the future is not an 'assignment'").

Nearly everything DC randomly quotes comports with the fact that the parties contemplated (hence, the future tense) entering into a regular agreement

11

containing all terms, including a proper copyright assignment.  But as it turned out the parties disagreed as to what those terms were and should be.  ER-560-630.

DC argues the parties reached a "final binding accord."  <u>First</u>, even if true, it would not convert a promise to assign into a present assignment.  <u>Second</u>, neither party intended Marks' October 19 Letter to be the "final binding accord" as objectively demonstrated by Marks' October 19 Letter asking whether "any aspect of the above is somehow misstated" (ER-565); and DC's October 26 response, indicating different material terms and that it would put this transaction "in document form." (ER-566).

Puffery as to a "monumental accord" is no substitute for contract law.  *See Valente-Kritzer Video v. Callan-Pickney*, 881 F.2d 772, 775 (9th Cir. 1989).  DC misleads by selectively quoting Marks (SB-25) despite his testifying *in extreme detail* why no agreement was reached.  ER-1359:12-1367:5.

DC argues the non-sequitur that if Marks agreed the Siegels "would" assign their copyrights on an October 16 call, the October 19 Letter "documented the transfer."  SB-24-25.  But Marks simply reviewed the terms he believed were discussed, asking DC for confirmation.  ER-560-65.  Marks reiterated the Siegels "would transfer" their rights in the written agreement still to be hammered out, to which DC refers on October 26.  ER-566.  DC's October 26 Letter outlines the rights DC believes should be transferred and these *differ* from those in Marks'

12

October 19 Letter.[2]  If Marks' outline was an actual assignment, why would DC outline different rights to be assigned in response?  It all makes no sense.

DC makes a mountain out of Marks' comment that the money is "a prepayment" "[i]f for any legal reason there cannot be a transfer of all rights at this time" (ER-562); arguing it "presupposes a *present* transfer."  SB-25.[3]  But "at this time" is consistent with Marks' contemplation that the parties would soon enter into a traditional agreement.  *See* ER-566 (DC: "[B]y the time you have [returned] we will have this super-matter transaction in document form.").  And DC's February 1 Draft contained that assignment.  ER-587-95.  DC omits Marks' reference to a pending *Spectre* termination to which he was referring.  ER-562.

DC's argument that it would not promise to pay "millions of dollars" for a promise to assign is also unpersuasive because that is not unusual.  SB-25.

Whereas the Letter's plain "would transfer" language justifies summary judgment for Larson; that language and the other record evidence preclude finding an actual assignment on DC's summary judgment motion.

---

[2] Marks' October 19 Letter was limited to "Superman, Superboy" and "Spectre."  ER-560.  DC's October 26 Letter was much broader, including those "even if not created for DC" *plus* "100%" of anything else Siegel ever authored "for DC Comics (whether or not published)".  ER-567

[3] This also does not advance DC's claim because for "legal reason(s)," "[t]he Siegel Family would transfer" does not "effectuate" a present assignment, thereby necessitating a "future transfer."

2.     <u>DC Cannot Convert a Contingent Promise into an Actual Assignment</u>

DC's tortured legal arguments fare no better.  SB-26-28. DC cites *Radio Television Espanola S.A. v. New World Entm't, Ltd*., 183 F.3d 922, 927 (9th Cir. 1999) for "[n]o magic words must be included."  Larson agrees, relying on the Letter's contrary text.  "Rather, the parties' intent as evidenced by the writing must demonstrate a[n] [actual] transfer of the copyright."  *Id.* (finding no transfer). *Espanola* emphasized that "with the fax concluding that [party] is 'awaiting the contracts,' we can view the fax only as part of an ongoing back-and-forth between two parties hammering out the final details of the agreement."  Just so, here.  ER-566 ("we will have this…in document form."); ER-574 ("as "to certain 'Stand Alone Assignments.' We are finalizing those…").

DC argues the non-sequitur that because the October 19 Letter "contained much more than a 'one-line pro forma statement'" it is a present copyright assignment.  SB-26.  But surrounding a contingent promise to assign (at best) with other terms does not make it an actual assignment. The point is that Marks' "one-line ['would transfer'] statement" is plainly <u>not</u> an assignment.  And the Letter's list of relevant characters, etc., is equally applicable to a contingent promise.  DC's

string-citation of readily distinguishable out-of-Circuit cases is also not compelling.[4]

The October 19 Letter describes many of its terms in the same future tense, in contemplation of an agreement.  *See e.g.* ER-564¶12 (Siegels "*would agree* to execute further documents" and DC "*would be appointed* as attorney-in-fact…"); ¶13 (Siegels "*would not make* any warranties…but *would represent...*"); ¶13 (Siegels "*would agree* that there will be no interference....") (emphases added).

Its statement—"if there is any aspect of the above that is somehow misstated" (ER-565) and DC's October 26 response of "what we believe the deal we agreed to is" (ER-318) hardly connote a completed assignment or transaction. Furthermore, the assignment language in the rejected February 1 Draft is in the present, not past tense.  ER-319.

DC's quote from *U.S. v. Kales*, 314 U.S. 186, 196 (1941) is also misleading. In a case that had nothing to do with contracts or assignments, the "future tense" of Kale's statement was only discussed to explain why her tax-overpayment claim was not time-barred.  *Id.* at 190-191,196.

---

[4] *Peterson v. Kolodin,* 2014 WL 502983,*4-5 (S.D.N.Y. 2014)(unpublished decision holding *present assignment language* constituted an assignment); *Gilleland v. Schanhals,* 55 F.App'x 257, 260 (6th Cir. 2003)(extrinsic evidence under Michigan law clarified ambiguity in founder's assignment to company); *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 412-13 (7th Cir. 1992)(total sale of photography business's property included intellectual property).

DC cannot distinguish key cases favorable to Larson—*Board of Trustees. v. Roche Molecular Sys., Inc.,* 583 F.3d 832, 841 (Fed. Cir. 2009) *aff'd* at 131 S.Ct. 2188, 2194 (2011)("*Roche*"); *IpVenture, Inc. v. ProStar Computer, Inc.,* 503 F.3d 1324, 1327 (Fed. Cir. 2007); *Arachnid, Inc. v. Merit Industries, Inc.,* 939 F.2d 1574, 1580-81 (Fed. Cir. 1991)—so it mischaracterizes them.  DC argues they hold that contract phrases like "'agree to assign' constitute a mere promise to assign…not an immediate transfer," because they concern "*yet-to-be-discovered inventions.*" SB-27, citing *Roche*.  Not true.

That inventions were not yet developed had no bearing on the basic principle applied in these cases because *assignments of future inventions not yet developed are enforceable.*  See *Roche*, 583 F.3d at 841-842 (noting party "effected a present assignment of [] future inventions" in *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000)).  *See also Abraxis*, 625 F.3d at 1365 ("'[A]grees to assign' reflects a mere promise to assign rights in the future, not an immediate transfer of expectant interests."); *Arachnid,* 939 F.2d at 1580-81 ("Nor does the provision amount to a present assignment of an expectant interest.").  Thus neither *Arachnid, supra* ("will be assigned" is not "a present assignment"), *Abraxis*, nor *IpVenture,* 503 F.3d at 1327 ("agree to assign" requires a subsequent conveyance) are based on DC's immaterial distinction.

DC's attempt to distinguish *Bass v. Olson*, 378 F.2d 818, 822 (9th Cir. 1967) is also unavailing because *Bass* found no present transfer due to a contingent promise.

DC's argument that it "specified the consideration being exchanged" (SB-26) belies itself. The district court held at DC's insistence that the Siegels transferred their valuable copyrights on October 19, 2001. ER-4. DC previously alleged that under the October 19 "agreement," "upon transfer to DC…DC would provide upfront payments of $3 million" plus a "guaranteed advance." ER-560-65, 2673. But DC did *none of this* nor even tender payment. Instead, it insisted that terms be materially revised as a condition to performance. ER-566-630.

Contrary to DC's frivolous assertion (SB-38) the Siegels' repudiation/rescission on May 9, 2002 due to DC's conduct does not excuse its non-performance for *six-and-one-half months* beforehand. DC's contract assertions are too riddled with contradictions to make any legal, equitable or common sense.

3.    DC's "Power-of-Attorney" Argument Is Waived and Unpersuasive

This argument is untimely and waived. DC did not move on this ground below (ER-1651-62); and merely remarked in its reply: "Larson fully empowered *DC* to make the transfer." ER-952. The court never ruled on this, "undoubtedly relying on the principle that 'issues cannot be raised for the first time in a reply

17

brief.'" *In re Rains*, 428 F.3d 893, 902 (9th Cir. 2005) (citation omitted) ("claim

waived on appeal").[5]  "It is well-established that an appellate court will not

consider issues that were not properly raised before the district court."  *Weber v.*

*Dep't of Veterans Affairs*, 521 F.3d 1061, 1063-64 (9th Cir. 2008).

Aware of its error, DC takes the offensive arguing that Larson waived her

ability to contest it in *Larson 1*.  SB-28-9 But nothing in that "contract formation"

appeal included this issue. SER-1185-97

DC's power-of-attorney argument is also meritless.  The Letter states:

The Siegel Family *would agree* to execute further documents, and DC
*would be* appointed as attorney-in-fact to execute *such documents*….

ER-564 (emphasis added).  This suffers from the same infirmity as DC's

impossible assertion that "would transfer" effected a present assignment.

Its future tense underscores that the Letter facially contemplated a standard

agreement that never happened due to DC conditioning its performance on one-

sided changes.  ER-560-630, 1238-42, 1360:4-69:1.  Again, what the Siegels

"would agree" to do therein, is not like doing it, especially with something so

consequential as assigning away one's copyrights or giving adverse parties power-

of-attorney.

Compounding this, DC's "would be" appointment applies to undefined

---

[5] Contrary to DC's false assertion the court also did not rule that Larson was
"contractually obligated to transfer" (SB-29)—a different issue implicating DC's
antecedent breach.

18

"further documents" they "would agree to execute." This suggests that it does not

apply to the core assignment. Such clauses are used to effect ministerial filings.

Finally, "a power [of-attorney] is revocable unless coupled with 'a …

present and coexisting interest in the subject of the power.'" *Jay v. Dollarhide*, 3

Cal.App.3d 1001, 1023 (1970) (citation omitted); Cal. Civil Code §2356(a)(1).

Even if DC was granted power-of-attorney, this would be revocable as DC had no

"present interest" in the Siegels' recaptured copyrights, and they revoked this long

ago. ER-340-41, 349-50 ¶¶55-56,100.

## II.   LARSON AT NO TIME WAIVED HER IMPLICIT RESCISSION REMEDY OR HER EXPRESSLY PLED ACQUIESCENCE DEFENSE

### A.   Larson Properly Asserted Rescission and Acquiescence on Remand

Parties clearly may move for summary judgment on certain grounds, while

preserving others for trial. Fed. R. Civ. P. 56(a). In 2007, when the parties cross-

moved for partial summary judgment, the Siegels successfully moved on DC's

Third and Fourth Counterclaims. ER-3237-53. DC did *not* move for summary

judgment on its alleged agreement. ER-3255-3373. It argued that issues of fact

*prevented* summary judgment as to contract formation. ER-2720-38.

The 2008 ruling (ER-186-271) and 2011 judgment (ER-282-84) that no

agreement was consummated, eliminated any reason for the Siegels to make

alternative post-contract arguments. In 2013, *Larson I* "reversed, in part" and

remanded for adjudication of DC's Third and Fourth [Contract] Counterclaims "in light of our holding that the October 19, 2001, letter created an agreement."  ER-277.  The district court "therefore proceed[ed] to determine whether events after October 19, 2001, rendered" it "unenforceable."  ER-28.

DC *for the first time* moved for summary judgment on its Fourth Counterclaim, whereupon Larson properly made her rescission and acquiescence arguments.  ER-1651-62.  *See Morrison v. Mahoney*, 399 F.3d 1042, 1046 (9th Cir. 2005) ("a party can[] raise on a remand a point not reached when that same party prevailed previously").

The district court faulted Larson for this time span, disregarding that she had argued rescission/acquiescense at the appropriate juncture.  ER-34, 1651-62.  For instance, it erroneously held that Larson "waited nearly eight years to raise [] abandonment and acquiescence" (ER-34) when she *expressly* pled acquiescence as an affirmative defense in 2004.  ER-869; ER-313.

### B.    The Siegels' Rescission and DC's Acquiescence Were Also Implicit in the Facts, Pleading, and Discovery.

DC cannot feign surprise or prejudice because the Siegels' repudiation or rescission of the October 19 Letter and DC's acquiescence was part and parcel of this case from the outset.  The Siegels' May 9 Letter (pled by DC as a repudiation of their October 19 Letter) was a focal point of DC's discovery.  ER-2933.  And that Letter screamed "rescission":

> For your representatives to condition our receiving financial compensation for our rights on demands which were not in the proposal we accepted [on October 19], is deceitful.…
>
> I had hoped that Laura's and my good relationship with DC … would continue after we reached an agreement.…
>
> After four years we have no deal and this [February 1] contract makes an agreement impossible.

ER-1328-30, 1242-44.  DC's "surprise" is discredited by the notice itself.

In alleging that the May 9 Letter repudiated the October 19 Letter (ER-349-50, 2933), DC was well aware of these issues.  *See Runyan v. Pac. Air Indus*., 2 Cal.3d 304, 316 n.15 (1970)("The remedy of rescission necessarily involves a repudiation of the contract").

DC alleged "an actual controversy" as to whether the October 19 Letter "is binding and [still] enforceable," further implicating these issues.  *See In re Lopez*, 345 F.3d 701, 705 (9th Cir. 2003) (holding that although rescission was not explicitly pled "the [parties] were entitled to rescind the agreement" as "the validity of the contract is the central claim").  In fact, the court found it necessary to rule on rescission and acquiescense/abandonment due to DC's pleading.  ER-7.[6]

Larson also pled the factual predicates for rescission and denied that DC

---

[6] Larson mistakenly stated she pled "rescission and failure of consideration" in *DC Comics*.  OB-37.  This was purely inadvertent.  It was originally: *Defendants* pled failure of consideration, a basis for rescission, and the mistake occurred in the editing process.

performed the October 19 "agreement."  ER-304, 309, 97-105.  *See Simmons v. Navajo County*, 609 F.3d 1011, 1023 (9th Cir. 2010) (answer "den[ying] the allegation," plus summary judgment opposition, gave adequate "notice").

The Siegels' May 9 Letter also tracked DC's unperformed obligations in explaining why they were rescinding:

> (1) "accounting on Superman…has not been paid"; (2) "my disabled daughter still has not received the medical coverage she and her children were promised" and (3) DC "condition[ed] our receiving financial compensation for our rights on demands which were not in the proposal we accepted [on October 19]."

ER-1329.  DC's contrived argument that this does relate to October 19 obligations is nonsense.  *See* ER-563 (promising this medical coverage).

Naturally, DC fully deposed Joanne Siegel about the letter at her full-day deposition (ER-499) and deposed Larson about the letter in two full-day depositions.  ER-485-86, 1179-84, 1347-53.  DC had ample opportunity to discover all facts relevant to the May 9 Letter.  Moreover, a court looks to objective manifestations of intent, and there is nothing ambiguous about this letter "which clearly shows the intention….to consider the [October 19 Letter] at an end."  *Wilson v. Lewis*, 106 Cal.App.3d 802, 809 (1980); *see* ER-29.

DC pretends the district court ruled that Larson's rescission remedy and acquiescence defense were waived.  However, after DC emphatically pressed waiver in its *reply* (ER-943-60), the court ruled on the *merits*.  ER-31-34.

DC had pled (ER-340-41) and represented in *Larson I* that the May 9 Letter *acknowledged an agreement* to convince the court that one had been reached. ER-775; ER-1477. On remand, DC was two-faced, arguing no "notice of rescission" because the Siegels *did not acknowledge an agreement*. ER-958. Although Larson showed that DC was judicially estopped (ER-543) the court adopted DC's erroneous position as the central plank of its ruling that there was no notice of rescission "as a matter of law." ER-31. ("First and foremost, neither letter even recognizes a contract at all."). Thus, the court emphasized "eight years" and that "the Siegels have argued since the inception…only that no contract was formed" to support this incorrect legal notion, and not waiver. ER-32-4

In opposition to Larson's Rule 59(e) motion, DC proclaimed that the court found a "waiver" (ER-28), but the court described its judgment as a finding on the merits with no word about waiver. ER-7.

## C.    DC Cannot Refute that Rescission Is a Remedy Preserved by Larson

DC cannot deny Cal. Civil Code §1691(b) and the legion of cases that deem rescission a "remedy." *See e.g.*, *In re Lopez,* 274 B.R. 854, 864 (B.A.P. 9th Cir. 2002) *aff'd*, 345 F.3d 701 (9th Cir. 2003) (CA law; "failure to plead" "remedy of rescission" in "their answer did not preclude…court from rescinding the agreement."); *Mendoza v. Wilmington Finance*, 2011 WL 2182914 at *2 (N.D. Cal. 2011) (CA law; "unconscionability is an affirmative defense to enforcement

and rescission is a remedy.").   Instead, DC meekly asserts that California also "permits" rescission "'by way of a defense.'"  SB-37.

Nor can DC refute that by denying DC's contract counterclaims in her Answer, Larson preserved all her remedies.  ER-3391-92.  Larson requested that she "be awarded such other and further relief, both general and special, as the Court may deem just and proper" (ER-3404 ¶6), and a court "will not read ["rescission"] out of [such] prayer."  *Regus Management Group, LLC v. I.B.M. Corp.*, 2008 WL 1836360 *3 (N.D. Tex. 2008).

### D.    Affirmative Defenses May Be Raised for the First Time on Summary Judgment Absent Demonstrable Prejudice

Even if Larson had not preserved her rescission remedy and specifically pled acquiescence, and even if this were not inherent in the facts pled and issues presented, this Circuit, like most, holds that so long as there in no real prejudice un-pled affirmative defenses may be raised for the first time on summary judgment, as this is well before trial.  *Magana v. Commonwealth of Northern Mariana Islands,* 107 F.3d 1436, 1446 (9th Cir. 1997); *Ahmad v. Furlong,* 435 F.3d 1196, 1201–02 (10th Cir. 2006) (collecting cases).

No circuit adheres to DC's draconian interpretation of Rule 8(c).  DC not only took full discovery of all relevant facts, it fully responded in its motion briefs.  ER-958-59.  *See Cedars-Sinai Med. Ctr. v. Shalala*, 177 F.3d 1126, 1128-29 (9th Cir. 1999) (finding no prejudice where unpled affirmative defense briefed and

counterparty could respond).

DC made no showing of prejudice below, offering but a single conclusory statement in its reply. ER-954. Nor did DC move to take further discovery or for a continuance. *See In re Nat'l Lumber & Supply, Inc*., 184 B.R. 74, 79 (B.A.P. 9th Cir. 1995)(party "had the opportunity to seek a cure for any alleged prejudice it suffered, but no such relief was requested."). Nor would DC have been deprived of offering evidence, if any, at trial. *See Ball Corp. v. Xidex Corp.,* 967 F.2d 1440, 1443–44 (10th Cir. 1992)("The purpose behind rule 8(c) is that of putting plaintiff on notice well in advance of trial.").

Even now, all DC can muster is that Joanne Siegel died in 2011. DC forgets it fully deposed Joanne regarding all the letters, and all other matters remotely relevant to the failed negotiations. ER-499. Moreover, DC admits "Joanne's intent in sending her [May 9] letter…is irrelevant to what the letter actually said[.]" SB-34 Larson was deposed twice regarding the May 9 Letter and the negotiations, in separate all-day depositions. ER-485-86, 1179-84, 1347-53. Like Larson, all other witnesses—Schulman, Marks, Levitz—were deposed and remain available. ER-1354, 1402.

DC has never even tried to show "what specific additional discovery would be required" nor "additional facts that need to be obtained through discovery or how any additional facts would defeat" Larson's assertion of rescission (or

acquiescence).  *U.S. Fire Ins. Co. v. Williamsburg Nat. Ins. Co.*, 2008 WL 5054107, *8 (E.D. Cal. 2008).  Nor may it do so for the first time on appeal in its reply.  *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1289 n.4 (9th Cir. 2000).

The court, in turn, engaged in no adjudication of actual prejudice; it simply *quoted* DC's single conclusory statement.  ER-32.  DC argues that "the court's prejudice finding was amply supported by the record," but again cites nothing to support its bluster.  SB-33.  DC's "clear error" standard of review (SB-17, 33) is also wrong. "The findings of fact in" an "order of summary judgment are not protected by the deferential clear-error standard of review."  *Swarner v. United States*, 937 F.2d 1478, 1481 (9th Cir. 1991); *see Albino v. Baca*, 747 F.3d 1162, 1174 (9th Cir. 2014).[7]  Moreover, "where such findings are drafted by the prevailing party's counsel and adopted verbatim…it may be appropriate to 'scrutinize them with greater than usual care.'"  *Swarner*, 747 F.3d at 1481. (citation omitted).

## III.  DC'S ARGUMENTS REGARDING RESCISSION AND ACQUIESCENCE ARE MERITLESS

DC does not rehabilitate its erroneous argument, adopted by the district court, that there can be no rescission because Larson purportedly did not

---

[7] Hence, *Johnson v. Wells Fargo Home Mortgage, Inc.*, 635 F.3d 401, 422 (9th Cir. 2011), the sole case DC cites applying "clear error" to a prejudice finding, did so *after* a jury trial.  *Solis v. Washington*, 656 F.3d 1079 (9th Cir. 2011), reviewed no fact findings and never discussed prejudice. SB-17,33.

26

"acknowledge[e] that a contract exists" or provide "any justification for rescinding." SB-39. As shown, this is *not* the law and even if it were, the May 9 Letter did both. Nor does DC salvage the incorrect ruling that there was no acquiescence despite DC's contrary conduct for years, simply because DC alleged a contract among numerous "alternative" counterclaims *after* it was sued in November 2004. ER-29. DC's factbound arguments, at best, underscore that genuine issues of fact precluded summary judgment in its favor.

### A.    The Rescission Ruling Was Wrong

####    1.    No Requirement that Rescinding Party Acknowledge an Enforceable Contract

California nowhere requires that a rescinding party first acknowledge a binding contract. *See Donovan v. RRL Corp.*, 26 Cal.4th 261, 276-278 (2001); *People ex rel. Kennedy,* 111 Cal.App.4th at 133 (2003). In fact, a party can rescind for a defect in contract formation. Cal. Civil Code §1689(b)(1),(b)(5).

Neither DC nor the district court has cited a single California case to support this non-existent requirement. DC fails to distinguish *Donovan* which (1) found a contract over defendant's denial, but (2) held defendant "gave sufficient notice of its intent to rescind" by refusing to perform. 26 Cal.4that 270, 278 n.5, 294-95.

In any event, the May 9 Letter stated "[we] accepted DC's last proposal" and

27

"we reached an agreement"[8] and made it crystal-clear that the Siegels considered it at an end.  ER-1228-1330. "'[I]t is not necessary that the notice to rescind shall be formal and explicit; it is sufficient that notice…shows the intention of the person rescinding to consider the contract at an end.'"  *Donovan,* 26 Cal.4th at 278 n.5 (citation omitted).

### 2.     DC's Anticipatory and Actual Breaches of the 2001 Letter Were Ample Grounds for Rescission

DC's circular excuse for its non-performance—that the May 9 Letter "repudiated"—disintegrates with the realization that this was sent six-and-one-half months *after* the October 19 Letter.  ER-566-73, 1328-31.

To claim performance, DC recycles its misleading statements that it "established a reserve account that now contains over $20 million."  DC said the same thing *in 2006* claiming the same $20 million (ER-1405-12), which itself is troubling as the Siegels' compensation was largely a percentage-royalty.  But it turned out that DC's so-called "account" was an internal "book-keeping function" and even that remains unsubstantiated.  *Id*.

DC, for the first time, styles its October 26 Letter as a "long-form draft" (SB-10) underscoring that its "long-form" excuse is and always has been fallacious.  Schulman's October 26 Letter, just like Marks' October 19 Letter was

---

[8] Notably, when the Siegels sent this, they were unaware of DC's October 26 Letter with differing terms.  ER-1257-1270, 245.

an attorney's outline of a purported October 16 discussion.  But its terms differed, all in DC's favor.[9]  ER-560-73.  DC's February 1 Draft, intended as the actual agreement, further widened this gap. ER-1359:12-1367:5

This was not about simply incorporating October 19 terms in "a long-form" with boilerplate, this was DC *changing* the October 19 terms and conditioning its performance on the Siegels' capitulation.

DC's "claw-back" tactics justified the Siegels' May 9 rescission of their October 19 acceptance.  *See U.S. for Use of Bldg. Rentals Corp. v. W. Cas. & Sur. Co.*, 498 F.2d 335, 339 (9th Cir. 1974) ("[R]escission is justified where there is either an extended and unreasonable delay [or] imposition of new and onerous conditions to payment"), *Johnson v. Goldberg*, 130 Cal.App.2d 571, 576 (1955) ("Annexing an unwarranted condition to an offer of performance is a refusal to perform[.]").

If, as DC later insisted and *Larson I* held, the October 19 Letter was a "contract" that "accurately reflected the material terms" (ER-275) and it "controls" (ER-769), "nothing more" (ER-37; ER-1599:23-1600:1) then DC breached it by failing to perform its *unconditional* obligations including payments on signing, accounting by March 31, 2002 and insurance.  ER-560-65.  DC cannot have it both

---

[9] *Larson I* (ER-272-77) did not disturb the court's findings regarding materially different terms in DC's October 26 Letter and February 1 Draft (ER-186-271) incorporated in the 2011 judgment (ER-282-84).

ways.

Now that the district court has ruled, at DC's urging, that the October 19 Letter "transfer[red] the Siegels Superman rights to DC" (ER-34-37), the failure of consideration and DC's breach is even more egregious.

Nevertheless, DC argues there can be no rescission because Larson "never returned…a non-returnable $250,000." SB-43. DC struggles to tie this "2000" payment to the "2001 Agreement" but this money had no strings attached—hence, it was "non-returnable." ER-561. DC's argument that the 2001 Letter made this non-recoupable against the Letter's royalties is circular because if that Letter were rescinded this aspect would be moot.

### B.    The Court Erred in Dismissing Larson's Acquiescence Defense

Despite its dismissive tone, DC never addresses its failure to assert a binding 2001 contract upon receiving the Siegels' May 9, September 21 and October 28, 2002 letters. ER-1332, ER-2349-51. The first time DC alleged this was on November 22, 2004, among numerous "alternative" counterclaims/defenses to the Siegels' suit. ER-340-41, 349-50.

Before this DC *never* claimed that the parties were bound, asserted ownership of the recaptured copyrights, demanded performance, performed or tendered performance of its October 19, 2001 contract. "[I]t is well settled that an abandonment of a contract may be implied from the acts of the parties

30

and…accomplished by the repudiation [of one]…[and] the acquiescence of the other[.]" *Grunwald-Marx, Inc. v. L.A. Joint Board, Amalgamated Clothing Workers,* 192 Cal.App.2d 268, 279-80 (1961).

Instead DC engaged in new contract negotiations with Larson's new representatives in 2003-2004. ER-1346, 1392:12-1399:2, 1629. *See McCreary v. Mercury Lumber Distributors*, 124 Cal.App.2d 477, 486 (1957) ("[A]cquiescence is shown by the negotiations for a new contract after [counterparty] had locked the gate and by the absence of a showing that [party] claimed any further rights under the old contract prior to the commencement of the subject action").[10]

DC fabricates that it "tried to persuade [Larson] to honor the agreement" at these negotiations, solely citing ER-1346 which lends _no support_. Tellingly, DC never asserted this falsehood below when Larson pointed to the same 2003-2004 negotiations. ER-1203, 943-60.

DC's total silence and inaction from May 9, 2002 to November 22, 2004 and new negotiations in 2003-2004, under circumstances where one would immediately assert a binding contract, clearly raise triable issues as to DC's acquiescence/abandonment. The district court's summary denial because DC first

---

[10] DC fails to distinguish *McCreary* (SB-45) where a new written contract was not consummated, its language—"negotiations of a new contract"—*supports* Larson and was quoted by her (OB-56). 124 Cal.App.2d at 482, 486. Nor did the parties make a new contract in *Honda v. Reed*, 156 Cal.App.2d 536, 538 (1958); nor did the parties "mutually rescind" (SB-45).

31

asserted a 2001 contract as a defendant in a 2004 lawsuit and "spent millions of dollars" fighting the Siegels (ER-33) defied Rule 56(f) and due process.

*****

DC's web of contradictions is only getting more tangled.  However DC was right about one thing: "The question of whether the subsequent events undid the prior [October 19] agreement or didn't undo the prior agreement, that's a fact question." ER-1598.[11]  Respectfully, reciting the legal standards governing summary judgment is futile if the district court does not abide by or enforce them. The evidence, at a minimum, raised genuine issues of fact invoking Larson's right to trial.

## IV. THE DISTRICT COURT'S HOLDING THAT THE 2001 LETTER ANTICIPATORILY TRANSFERRED LARSON'S UNVESTED TERMINATION INTEREST IN SUPERBOY AND THE ADS CONTRAVENES THE STATUTE

This aspect of the appeal is straightforward despite DC's efforts to obscure. In 2008, the district court granted *DC's* motion that the 1997 notices of termination ("1997 Termination") excluded the Superman Ads and other works, published

---

[11] In opposition to Larson's 2007 summary judgment motion on DC's Third and Fourth Counterclaims, DC insisted:  This "is not the province of the Court…It would require the Court to address and resolve questions of fact, weigh the evidence, and assess the credibility of the witnesses none of which can properly done on summary judgment." ER-2720. "DC should be permitted to present its contract Counterclaims to a jury for determination at trial."  ER-2722.

outside its April 16, 1938–April 16, 1943 statutory "window." ER-219-20.

"Superboy's" first appearance in *More Fun Comics*, No. 101 (1944) ("*MF#101*")

was likewise excluded. ER-219-230. The Siegels therefore served termination

notices regarding Superboy/Ads in 2002/2012, respectively. ER-631-43, 756-61.

On October 19, 2001 DC still owned the Ads and Superboy works pursuant

to Siegel's original grants and obviously his family could not assign what DC

already owned. ER-219-20. In 2001, they likewise could not transfer or promise

to transfer any expectancy from un-served terminations notices as that is forbidden

by Section 304(c)(6)(D). The Siegels also could not waive their termination rights

regarding the Ads/Superboy as that is prohibited by Section 304(c)(5), and no court

has ever held otherwise. Finally, the October 19 Letter did not fall under *Milne's*

narrow exception because it did <u>not</u> revoke the author's copyright grants as

correctly found by the court. 430 F.3d at 1044; ER-18 ("[T]his case does

not…implicate a revocation and regrant scenario.").

### A. The Copyright Act Prohibits the Anticipatory Assignment or Waiver of Future Termination Interests

DC's vague contract arguments (SB-45-60) are preempted by Section

304(c)(6)(D)("A further grant, or agreement to make a further grant, of any right

covered by a terminated grant is valid only if it is made after the effective date of

the termination" or as to "the original grantee or [its] successor…after the notice of

termination has been served[.]"). DC waived its right to contest this. Neither DC

(nor the district court) addressed this dispositive provision raised by Larson below (ER-12-22, 842-66). *See United States v. Anekwu*, 695 F.3d 967, 985 (9th Cir. 2012)("An appellant waives arguments by failing to raise them in the district court."). DC's Second Brief also omits it. *See Dream Games of Arizona, Inc. v. PC Onsite,* 561 F.3d 983, 994–95 (9th Cir.2009).

Oblivious, DC argues that the October 19 Letter states the Siegels "would transfer…'Superboy'." DC even tries to deceptively rope in the Ads by quoting "Property" as including "all pre- and post-termination works," exclaiming "[a]ll means all." SB-28. But "Property" is relevant solely to the Siegel's royalty, (applies to "the entire Property"). ER-561,¶A.5. The "would transfer" language does *not* apply to "Property." ER-562,¶C.12.

DC argues the legally irrelevant non-sequitur that because "Larson plainly intended to terminate Superboy in her 1997 notices" the 2001 Letter transferred her Superboy copyrights recaptured in <u>2004</u> per her <u>2002</u> termination. By law, the Letter could, at best, only promise to transfer copyrights recaptured in the 1997 Termination.

DC successfully excluded numerous works from the 1997 Termination as outside its temporal reach under Section 304(c)(3). ER-219-24, 8-11. The Ads are a prime example. DC argued that the Siegels did not recover the Superman content first depicted in the Ads because they were published outside the five-year

34

statutory window (April 16, 1938-1943) of the 1997 Termination. ER-3304-10.

Accordingly, the court held that the Ads and their Superman content were

unaffected and still owned by DC. ER-219-30.

The same was true for Superboy first published in *MF#101* (1944).[12] DC

argues "Larson could notice its termination as early as 1990" because "MF#101

was published in 1944", and that Larson's 1997 notices "list MF#101"[13] (SB-

48)—*all totally irrelevant*. Because Larson served her termination notices on

April 3, 1997 (ER-205) only works published between April 16, 1938–1943 were

affected per Section 304(c)(3). This excludes *MF#101* (1944) and subsequent

"Superboy" works. ER-219-30. Larson therefore served Superboy notices in

2002.

### B. No Court Has Permitted the Waiver or Anticipatory Assignment of Future Termination Interests Because Both Contravene the Statute

DC again tries to mislead, stating "[t]his court has consistently upheld

assignments in yet-to-be terminated copyrights." SB-48-9 (citing *Milne*, *Penguin*

*Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193 (2d Cir. 2008) and *DC Comics v.*

*Pacific Pictures Corp.* ("*PPC*"), RER-13-24). Notwithstanding that *Steinbeck* was

---

[12] Though derivative of Superman, "Superboy" is a distinct copyrighted
character, spawning its own line of successful comic books and TV shows like
*Superboy* and *Smallville*. ER-2799-800.

[13] The 1997 notices listed nearly every Superman-related work in an over-
abundance of caution. ER-219-30.

not "this court," and that the unpublished *PPC* decision is non-precedential, <u>*none*</u> of these decisions permit a terminating party to pre-assign her interest prior to serving the relevant notice or to waive termination rights—as the statute prohibits both.

Instead, they stand for the same narrow, inapplicable proposition that parties can contractually *revoke* terminable pre-1978 copyright grants followed by a post-1977 grant which is non-terminable.  Although <u>this indirectly eliminates termination rights</u>, it is not, in the courts' view, "contrary" to those rights under Section 304(c)(5)("Termination…may be effected notwithstanding any agreement to the contrary[.]").  *See Milne*, 430 F.3d at 1045.

Congress enacted the termination right to remedy "the unequal bargaining position of authors."  H.R. Rep. No. 94-1476, at 124 (1976).  To prevent publishers from circumventing its objective, Congress decided that the right "cannot be waived in advance or contracted away." *Id*. at 125; S. Rep. No. 94-473, at 108 (1976).  These statements, like the statute itself, §§ 304(c)(5), (c)(6)(D), are crystal-clear.

As this Court acknowledged in *Classic Media, Inc. v. Mewborn*, "'the clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract.'" 532 F.3d 978, 985 (9th Cir. 2008) (quoting *Marvel*

36

*Characters, Inc. v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002)); *id.* at 988 (*Milne* never found a "waiver…of [the] right").

DC's vague argument, adopted by the district court, that the October 19 Letter "fully vindicated the purposes of the Copyright Act" is ineffectual. The statute still prohibits the waiver or pre-assignment of future termination interests. DC quotes *Milne*, 430 F.3d at 1044 and *Steinbeck*, 537 F.3d at 200—isolated from their fact-specific context—where an express contractual revocation, *not present here*, effectively eliminated the statutory right.

DC's "freedom of contract" theme (SB-49) and the district court's comment that the Letter was "freely and intelligently entered into" (SB-48) are red-herrings. First, the Letter did nothing that eliminates Larson's termination rights regarding the Ads/Superboy. Second, the entire termination regime lies in stark contrast to ordinary contract principles. *See* 17 U.S.C §304(c),(d), §203(a)(permitting termination of decades-old copyright grants, without cause). Its whole purpose is to protect authors/heirs against their "unequal bargaining position," by limiting their freedom to contract—and numerous features do so. *Id.*, §304(c)(5),(c)(6)(C), (c)(6)(D); H.R. Rep. No. 94-1476, at 124 (1976).

DC avoids the statute that defeats its arguments. Instead, it selectively quotes legislative history. But, of course, this cannot alter the statute's clear text. *See United States v. Woods*, 134 S.Ct. 557, 567,n.5 (2013).

37

DC relies on one sentence from one House Report stating that the Act should not "change the existing state of the law of contracts concerning the circumstances in which an author may terminate a license, transfer or assignment."  SB-49-50 (citing H.R. Rep. No. 94-1467, at 127).  This is another red herring because the Letter did <u>not</u> contractually terminate any pre-1978 copyright grants, unlike the contracts in *Milne*, 430 F. 3d at 1040 and *Steinbeck,* 537 F. 3d at 201. Furthermore, when this statement is properly read, in harmony with the statute, it makes sense only insofar as the "law of contracts" is not preempted.  For example, if the author had the contractual right to terminate a grant earlier, the statutory right supplements, rather than supplants it.   As the same report states such rights "cannot be waived in advance or contracted away," H.R. Rep. No. 94-1467, at 125, the language DC quotes cannot change this.

DC has previously also quoted part of a sentence from H.R. Rep. No. 94-1467, at 127.  RER-11. The full sentence (DC's omissions in italics) reads: "*Section 203 would not* prevent the parties to a transfer or license from voluntarily agreeing at any time to terminate an existing grant and negotiating a new one, *thereby causing another 35-year period to start running*." *Id*.[14]   But Larson and

---

[14] This describes a unique feature of Section 203 (governing authors' post-1977 grants)—*not applicable to Section 304 at issue here*.  A re-grant does <u>not</u> eliminate Section 203(a)'s termination right, which commences thirty-five years after the grant, but simply *re-starts* the clock.

her mother were not "parties" to the 1938 and 1948 grants, and the Letter did nothing to "terminate" those grants which remained intact as to the Ads and Superboy.

DC shrugs off that the Supreme Court has *thrice* recognized Congress's intent to create an "inalienable authorial right to revoke a copyright transfer." *N.Y. Times v. Tasini,* 533 U.S. 483, 496 n.3 (2001); *see Stewart v. Abend*, 495 U.S. 207, 230 (1990); *Mills Music v. Snyder,* 469 U.S. 153,172-73 (1985). It mischaracterizes *Milne* as "reject[ing] the notion that 'Congress intended to make the termination inalienable.'" SB-50. *See Milne*, 430 F.3d at 1043 (noting that, in its view, *Stewart* does not prohibit contractual revocation of pre-1978 grants).

In sum, both the text and legislative history of the statute establish conclusively that the 2001 Letter could not waive, anticipatorily assign or promise to assign Larson's future interest from her 2002 and 2012 terminations.

*****

*Kirtsaeng v. John Wiley & Sons, Inc.*, 133 S.Ct. 1351, 1366 (2013) reasoned that "[a] copyright law that can work in practice only if unenforced is not a sound copyright law. It is a law that would create uncertainty, would bring about selective enforcement, and, if widely unenforced, would breed disrespect for copyright law itself." The decision below and DC's arguments do precisely that.

### C.   DC's Argument that the 2001 Letter Revoked Siegel's 1938 and 1948 Grants Is Frivolous

DC did not allege in its answer/counterclaims that the October 19 Letter revoked and regranted or "novated" Siegel's original copyright grants. ER-323-60. In fact, DC alleged the opposite—that "[a]ll grants made by Siegel and Shuster of rights in Action Comics No. 1 *are still in effect*, and all rights under copyright granted therein are still owned exclusively by DC Comics." ER-346 (emphasis added). DC also alleged that "the Siegels served no notice terminating the copyright grant in the May 21, 1948 Consent Agreement" (ER-341) and that "the grant contained therein to all copyrights related to Superman [i.e., Superboy] *remains in full force and effect*." ER-343 (emphasis added). In 2007, DC argued: "Failure to Comply With…Section 304(c)…Results in the Original Copyright Grants Remaining Intact" ER-3307; ER-3311 (similar). Judge Larson accepted DC's argument regarding the Ads and all other works outside the 1997 Termination window (includes *MF#101*). ER-219-24, 3304-10, 2801-12.

Critically, "[f]actual assertions in pleadings...unless amended, are considered judicial admissions conclusively binding on the party who made them." *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). "A judicial admission is binding before both the trial and appellate courts." *United States v. Bentson*, 947 F.2d 1353, 1356 (9th Cir. 1991).

In its 2013 summary judgment motion, DC contradicted its own pleadings

frivolously arguing that the October 19 Letter revoked Siegel's original grants to DC, gave the Ads/Superboy back to Larson, and simultaneously assigned these back to DC in a non-terminable post-1978 agreement.  The October 19 Letter plainly contains no such terms, and according to DC (ER-1599:23-1600:1) and the court—"the parties are bound by the terms memorialized in Marks's October 19 letter; nothing more." ER-37.

The October 19 Letter never mentions Jerome Siegel's contracts let alone rescind them and Larson expressly testified that was not her intent.  ER-841).

In contrast to the Letter, the February 1 Draft stated:

> The SIEGELS have the right to, and are, hereby, contractually terminating any grant made by Jerome Siegel (…) at any time to DC…concerning the ACTION COMICS NO. 1 SUPERMAN Works.  In any event, The SIEGELS hereby simultaneously and irrevocably and in perpetuity make a new grant, transfer and assignment….

ER-586-88, 589-90 (similar for post-AC#1 works).  But the Siegels flatly <u>rejected</u> DC's Draft and new terms in their May 9 and September 21, 2002 letters.  ER-246-47; ER-30.

DC disingenuously says "the district court did *not* resolve whether the 2001 Agreement was a replacement contract" (SB-54) when it unequivocally did:  "this case *does not* – despite the parties' many pages of argument on the issue – *implicate a revocation* and regrant scenario."  ER-18 (emphasis added).

DC argues that the Letter novated the author's copyright grants by allegedly dealing with the same subject matter.  *Mewborn* firmly rejected the same vague

41

argument. 532 F.3d at 981-82, 989-90 (holding re-grant of rights already owned by publisher was a "nullity").

For a novation in California "[t]he intention of the parties to extinguish the prior obligation and to substitute a new agreement in its place must clearly appear." *Fanucchi & Limi Farms v. United Agri-Products*, 414 F.3d 1075, 1081 (9th Cir. 2005). *See also Howard v. County of Amador*, 220 Cal.App.3d 962, 977 (1990) ("Essential to a novation is that it 'clearly appear' that the parties intended to extinguish rather than merely modify the original agreement.").

"A novation does not occur whenever the parties to a contract enter into another contract, even if the second contract concerns the same subject matter ….the party claiming novation must demonstrate a mutual agreement to abandon and extinguish the earlier agreement[.]" *SGA, Inc. v. Banks Shippam, Ltd.*, 2002 WL 1897991,*8 (Cal. Ct.App. 2002).

Of course, the October 19 Letter is not even comparable. Siegel *assigned* his copyrights in Superman/Superboy, whereas the Letter states "[t]he Siegel Family "would transfer…its rights." ER-562. Besides being a promise, at best, it concerns the *Family's rights* and as DC previously asserted, and as shown above, the Family had no rights in 2001 to the Ads/Superboy.

Cal. Civ. Code §1530 defines a novation as "the substitution of a new obligation for an existing one." But the 1938/1948 grants were fully performed

decades ago (*i.e.*, assignments for cash). ER-2053-56, 2802-12; Cal. Civ. Code §1473 ("Full performance of an obligation…extinguishes it."); *Chartis Specialty Ins. Co. v. Aqua Sciences Engineers, Inc.*, 2013 WL 4647288 (N.D. Cal. 2013)("[F]ull performance under a contract discharges the obligation."). In 2001, Larson and DC had no "existing" obligations under these completed grants. In short, they had nothing to "novate."

DC asserts that a novation can be implied—another red-herring as the Letter nowhere *implies* any intent by Larson to extinguish her father's grants.[15] *See Davies Mach. Co. v. Pine Mountain Club, Inc.*, 39 Cal.App.3d 18, 24-25 (1974) (reversing *trial court's* finding of a novation "by implication" because "the burden of proof is on the party asserting [] a novation…and intention of the parties to extinguish the prior obligation…must 'clearly appear.'"). Those California cases that find an implied novation from all the surrounding circumstances do not relax the strict requirement that a novation be clearly manifested. *Alexander v. Angel*, 37 Cal.2d 856, 862 (1951). "Mutual consent [to rescind] can be implied by actions, but such actions must be 'positive' and 'unequivocal' in demonstrating the parties' intent." *In re Palmdale Hills Prop., Inc.*, 2012 WL 4791132, *3 (C.D. Cal. 2012) (quoting *Pennel v. Pond Union Sch. Dist.*, 29 Cal.App.3d 832, 838 (1973)).

---

[15] "The law refuses to read into contracts anything by way of implication except upon grounds of obvious necessity." *Frankel v. Board of Dental Examiners*, 46 Cal.App.4th 534, 545 (1996).

Neither the language "[t]he Siegel Family would transfer" their [recaptured] rights in Superman," nor anything else in the 2001 Letter, expressly *or* impliedly assents to revoking the author's 1938/1948 grants.

The few cases DC cites do nothing to advance its position. SB-51,54-55 *Olympic Fin. Co. v. Thyret* underscores that "the evidence in support of a novation must be 'clear and convincing'" 337 F.2d 62, 65 (9th Cir. 1964), and *Zarate v. Bruker Nano, Inc.* reiterates, "it must clearly appear that the parties intended to extinguish…the original agreement." 2013 WL 1247929, *2 (Cal.Ct. App.2013). SB-55.[16] Each affirmed findings by the *trier of fact* of circumstances, unlike those here, that clearly demonstrated a novation, drawing legitimate inferences in the *respondent's* favor—the converse of the summary judgment standard.  *See Williams v. Reed*, 113 Cal. App. 2d 195, 201-02 (1952) (finding no novation on summary judgment, and distinguishing *Alexander*, 37 Cal.2d at 859-861 as affirming trial under deferential standard).

DC heavily relies on *Pacific Pictures*, but cannot explain how this unpublished, non-precedential decision applying New York law to very different

---

[16] *See Simmons v. Sweeney*, 13 Cal.App. 283, 285-86 (1910) (successive real estate agreements—"The terms…were entirely inconsistent…everything done…was in pursuance of [second] agreement."); *Thyret*, 337 F.2d at 65 (parties have conflicting executory obligations under old and new promissory notes and only perform new note); *Zarate*, 2013 WL 1247929 at*2 (employees of sold company sign/perform new employment contracts with new owner).

contractual language (RER-15-16) has any relevance to the October 19 Letter under California law. *See* RER-23 (dissent finding no novation).

Here, as DC failed to meet its burden and the evidence must be viewed in the light most favorable to the non-movant Larson, it cannot be found that the Letter revoked or novated Jerome Siegel's grants. Indeed, the district court correctly ruled it did not. ER-18. Further, given that (1) the October 19 Letter contains no language extinguishing or even mentioning the author's 1938/1948 grants; (2) DC expressly pled and argued that such grants are "still in effect"; (3) DC provided no evidence that Larson intended to contractually revoke her father's grants; (4) Larson testified that this was never her intent; and (5) Larson rejected DC's February 1 Draft, judgment can and should be rendered for Larson.

### D.    DC's Arguments that Superboy and the Ads Were Works-For-Hire Are Procedurally Improper

#### 1.    DC Waived These Arguments Not Raised in its 2013 Motion

DC belatedly asserts factbound arguments regarding Superboy/the Ads never raised in its 2013 summary judgment motion resulting in this appeal. ER-1651-62. The court even requested supplemental briefing regarding Superboy/Ads. ER-37. Accordingly, DC waived these arguments. *See Anekwu*, 695 F.3d at 985.

45

### 2. DC Likewise Waived Arguments by Not Raising Them in *Larson I*

DC appealed the certified summary judgment rulings as to Larson's First Claim, including the Ads, in *Larson I*. ER-278-79. DC alleged that the Ads were "work for hire" but the district court did not find this. ER-858, 276-77. On appeal DC did not raise that "DC is the statutory author of the Ads" (SB-59), waiving that argument. ER-762-797, 1447-1505. *See Kesselring v. F/T Arctic Hero*, 95 F.3d 23, 24 (9th Cir. 1996) ("Since appellant failed to raise this issue in its first appeal, it is waived."); *Munoz v. Imperial Cnty.*, 667 F.2d 811 (9th Cir. 1982).

### 3. The Superboy Case's Merits Are Not on Appeal

The district court dismissed without prejudice the Superboy case (No. 04-cv-8776) based on its incorrect ruling that Larson assigned in 2001 the Superboy copyrights recaptured by her 2002 termination notice. Per Section 304(c)(6)(D) that decision and the dismissal must be reversed, and the Superboy case remanded. DC's attempt to litigate the entire Superboy case in this Court is procedurally improper. First, this is primarily a reviewing court, not "a court of first instance." *Vincent v. Trend W. Technical Corp.*, 828 F.2d 563, 570 (9th Cir. 1987). Second, the judgment appealed did not concern the Superboy termination's merits. Third, DC never cross-appealed to modify that Superboy judgment, and "[i]f an appellee seeks a modification of the district court's judgment, he must file a cross-appeal

requesting the modification." *United States v. Bajakajian*, 84 F.3d 334, 338 (9th Cir. 1996).

### E. DC's Work-For-Hire Arguments Are Meritless and, At Best, Raise Issues for the Trier-of-Fact

#### 1. The *AC#1* Cover Copied in the Ads is Not Work-for-Hire

The Ads depicted and first published *AC#1's* Cover.  That Cover, as determined by the district court (ER-232-33) and shown below was <u>not</u> a work-for-hire.  ER-232-33, 2970-71.  Whether the rest of the Ads were routinely assembled as works-for-hire is irrelevant to the preexisting Cover.  *See* 1 M. Nimmer and D. Nimmer, *Nimmer on Copyright ("Nimmer")*, §5.03[B][1][a][i].

DC's estoppel argument (SB-59) is meritless, and irrelevant to work-for-hire.[17]  The court ruled, *as alleged by DC* (ER-2944-45), that the Ads were unaffected by the 1997 Termination. ER-224

#### 2. Siegel's Superboy Was Protected and Not DC's "Work-For-Hire"

The Superboy case implicates two prior cases in 1947 and 1973.  In 1947 Siegel sued DC regarding Superman and Superboy.  Detailed finding of fact and conclusions of law were rendered. The court found DC owned Superman, but as to Superboy it found that (1) DC's first "comic strip release entitled SUPERBOY published in December of 1944 [*MF#101*] embodied [Siegel's Superboy material]

---

[17]  DC insisted to this Court that the lower court's comments regarding the Ads' literary elements were unnecessary "dicta," and erroneous.  ER-859.

ER-2791; (2) "[a]ll of the comic strip material published under the title SUPERBOY was based upon [Siegel's Superboy material], ER-2792,¶¶171-172; (3) "SUPERMAN…did not contain the plan, scheme, idea or conception of the comic strip SUPERBOY as it was later submitted by…SIEGEL" and "as published by from December, 1944 until [1948]," ER-2791,¶¶166-167; and (4) "Siegel, as the originator and owner of the comic strip feature ha[d] the sole and exclusive right to create, sell and distribute comic strip material under the title SUPERBOY of the type and nature [t]heretofore published [by DC]." ER-2799-800,¶¶25-26.

In May 1948, the parties executed a settlement agreement wherein Siegel assigned his Superboy copyrights to DC. ER-2806-12

In the 1973 action concerning the Superman renewal copyright, DC successfully argued that the 1947 findings were preclusive. ER-2963-64;ER-232-33. The Second Circuit affirmed, holding that the 1947 findings precluded plaintiffs from relitigating ownership of the Superman copyright. ER-2970-71..

The same applies to Superboy. *See* ER-2973-90 (Lew, J., granting Larson's motion that her 2002 termination was valid; denying DC's motion; and reserving for trial whether *Smallville* infringed Larson's recaptured Superboy copyrights).[18]

---

[18] Judge Lew took "senior status." The case was re-assigned to Judge Larson who granted DC's motion to reconsider Judge Lew, requested additional briefing, but never re-decided the applicable cross-motions. ER-1793-94.

ER-1791-94.  Even were DC's arguments not barred, they raise multiple issues for the trier of fact.

**DC'S CROSS-APPEAL ON LARSON'S FIRST CLAIM
AND DC'S SECOND COUNTERCLAIM**

## I.    *LARSON I* DID NOT TIME-BAR PLAINTIFF'S CLAIMS

The district court correctly held that the Siegels' claims for declaratory relief were timely filed.  ER-3-4, 242.

### A.    DC Waived Its SOL Argument Based on *Larson I* by Failing to Raise It on Remand

DC's new statute of limitations ("SOL") argument is based on *Larson I*.  On remand, DC moved for summary judgment (in both cases) on Larson's First Claim regarding the validity of her terminations and DC's Fourth Counterclaim (October 19 Letter), while offering to dismiss  its other counterclaims, including its Second Counterclaim (SOL).  ER-1651-62.  Despite numerous opportunities, DC repeatedly failed to make the SOL argument based on *Larson I* that it now raises on appeal.  The court granted DC's motion (ER-12-21) and entered DC's proposed judgment (ER-1720, ER-8-11).

Larson moved under Rule 59(e) to amend that judgment by, in relevant part, granting her First Claim upholding her termination *pursuant to the court's prior detailed rulings*, as this "law of the case" was neither reversed nor mooted by *Larson I*'s narrow holding, and dismissing DC's Second Counterclaim (SOL) *with*

49

*prejudice*. ER-437-67. Again, DC failed to make its SOL argument even though this was at issue. ER-416-36. The court granted Larson's motion in large part (ER-116) and entered its amended judgment dismissing DC's Second Counterclaim with prejudice (ER-1) and DC cross-appealed.

DC's SOL argument based on *Larson I* is waived for failure to twice raise it before the district court when it was directly at issue. See *Houglet v. Barra, Inc.*, 9 F.3d 1551, 1551 (9th Cir. 1993)("To decide the issue now would be to 'transform the court of appeals into a court of first instance.'")(citation omitted); *Hillis v. Heineman*, 626 F.3d 1014, 1019 (9th Cir. 2010).

### B.    DC Did Not Follow the Notice Procedures in the Tolling Agreement It Now Relies On

To facilitate settlement negotiations, DC and the Siegels entered into a Tolling Agreement effective April 6, 2000 (ER-2343-49) that neither "would assert any statute of limitations or laches defenses relating to …the [Termination] Notices" based on "the passage of time…from the date hereof until cancellation of this Tolling Agreement pursuant to paragraph 7[.]" ER-2344. Paragraph 7 provides for cancellation "10 business days after the earlier of: (a) one of the parties terminating negotiations, in writing, relating to the Notices, or (b) the parties reaching an amicable resolution of the disputes between them relating to the Notices," and that "[a]ny [such] notices required under this Agreement shall be sent by United States Mail, Return Receipt Requested to [five specified persons].

50

ER-2345-46.

As a preliminary matter, nothing indicates that paragraph 7's explicit *notice requirements* do not apply to <u>both</u> 7(a) and (b) which makes sense given that 7(a) ("amicable resolution") is subjective.  As DC never followed these notice procedures its alleged 7(a) cancellation is ineffective.  At most, DC's waived argument would raise an issue-of-fact regarding contractual intent.  *See Guidiville Band of Pomo Indians v. NGV Gaming, Ltd.*, 531 F.3d 767, 788 (9th Cir. 2008) (remanding "because…factual issues exist with regard to the contracts' interpretation).

### C.    The 2001 Letter Did Not "Amicabl[y]" Resolve "The Disputes"

*Larson I* simply held the October 19, 2001 letter was sufficient to constitute a contract.  ER-272-77.  The Letter can hardly be said to have amicably resolved the parties' "disputes" as shown by their ongoing settlement negotiations *and* disputes.  The Tolling Agreement states expressly that its purpose in suspending time-based defenses "is to encourage continued negotiations between the parties" (ER-2343), and it is undisputed that settlement negotiations regarding their multi-faceted disputes continued long after the October 19 Letter.

The October 19 Letter closes by asking—"if there is any aspect of the above that is somehow misstated, please let me know[.]"  ER-565   On October 26 DC's counsel sends a different outline, revising terms and referencing a draft agreement,

meaning further negotiation.  ER-566-73; ER-244-45; *see* fn.7, *supra*.  DC's

February 1 Draft contains many more changes, while reserving DC's "right to

comment" and negotiate further.  ER-574, 244-45.  DC's counterclaim alleges that

the parties' "Agreement," was "memorialized" in the October 19 *and* October 26

Letters (ER-339-41), which contemplated DC's February 1 Draft.  ER-566.

The Siegels had not seen DC's October 26 Letter, sent while their counsel

was abroad (ER-2489-90), but strongly objected on May 9, 2002 to DC's February

1 Draft.  ER-1328-30.  AOL-Time-Warner/DC responded on May 21, 2002—"we

continue to hope this agreement can be closed."  ER-1331.  DC asserts that in May,

2002, the parties were still negotiating, ER-2676, and that Marks drafted a new

settlement agreement around July 15, 2002. ER-2677.

On September 21, 2002, the Siegels sent DC a letter "stopping and ending

all negotiations" (ER-1332), but recognizing this did not comport with the Tolling

Agreement (ER-2345¶7) they sent an October 28, 2002 cancellation notice "[p]er

the Tolling Agreement."  ER-2350-51.  In response, DC did not say the Tolling

Agreement ended earlier.

To the extent the SOL even bars statutory termination, the Superman action

was timely because, as the district court found, "cancellation of th[e] Tolling

Agreement" occurred at the earliest on September 21, 2002.  ER-242.  DC

admitted in *Larson I* that "[i]f [the 9/21/2002] letter terminated negotiations" the

Siegels' claims were timely.  SER-1198.

### D.    DC's Argument, At Most, Presents Issues for the Trier-of-Fact

Notwithstanding its procedural and substantive infirmities, DC's argument

that all the parties disputes were "amicably resolved," implicates factual issues

precluding summary judgment in DC's favor, particularly when the evidence is

viewed, as it must, in the light most favorable to Larson.  *Thomas v. Ponder*, 611

F.3d 1144, 1149 (9th Cir. 2010).  Furthermore, a reversal and remand of the

rescission/acquiescence issues may moot DC's argument.

### E.    The Superboy Case and Ads Terminations Are Not Time-Barred

In no event would Larson be time-barred regarding her Superboy and Ads

termination notices because these first took effect in 2004 and 2014 respectively.

ER-638, 760.  Larson filed her Superboy case in 2004.  ER-1790.  No claim has

yet been filed by either side regarding Larson's Ads termination.

### F.    Strong Policies Disfavor Using Section 507(b) to Bar Statutory Termination

To relieve authors "of the consequences of ill-advised and unremunerative

grants," *Mills Music*, 469 U.S. at 172-73, "[t]ermination…may be effected

notwithstanding any agreement to the contrary" by the ministerial act of giving

notice within a defined time window.  17 U.S.C. §§304(c)(5), (c)(4)(A), (d)(1).

DC argued these statutory "windows" act as the SOL.  ER-3308.

While this Court need not determine this issue, as DC's argument is

53

otherwise defective, Congress surely did not intend that its objectives could so easily be foiled by a publisher's predictable denial of a termination notice's validity.  Otherwise, an author, after waiting 56 or 75 years for the termination window to open, *id.*, would forever lose her copyrights if she did not undertake, or could not afford, litigation within three years of any repudiation, *regardless of merit*.

Furthermore, cases applying Section 507(b) to co-ownership concern *co-authorship* disputes.  *See Zuill v. Shanahan*, 80 F.3d 1366, 1371 (9th Cir. 1996) ("Creation…was the gravamen of plaintiff's co-ownership claim[.]"); *Aalmuhammed v. Lee*, 202 F.3d 1227, 1230-31 (9th Cir. 2000)("Because creation is the gravamen of an authorship claim…[it] is barred three years from 'plain and express repudiation' of authorship.").   Here, it is well-settled that Siegel co-authored Superman (ER-2971-72) and that his daughter's interest is by operation of law under Section 304(c)2(B).

## II.    NEITHER *LARSON I* NOR DC'S FOURTH COUNTERCLAIM BAR JUDGMENT ON LARSON'S FIRST CLAIM

### A.    *Larson I* Did Not Concern the First Claim

*Larson I* held simply that the October 19 Letter "was sufficient to create a contract" on that date.  ER-274.  To that extent it "reversed in part" the district court's 2011 judgment (ER-282-84) based on its prior rulings (ER-87-271), and "remanded" for adjudication of DC's Third Counterclaim (breach of contract) and

Fourth Counterclaim (declaratory relief re: October 19 Letter).  ER-276-77.  DC

moved for summary judgment on its Fourth Counterclaim and dismissed its other

counterclaims.  ER-1214-1221.

DC's assertion that *Larson I* reversed the district court's detailed rulings on

the First Claim is frivolous, and its citations based on this false premise are thus

irrelevant. SB-62.  *Larson I* left the district court's adjudication of Larson's First

Claim, and DC's First and Second Counterclaims, untouched and "law of case."

ER-274,n.1 ("we do not reach the issues raised by these claims").  *See Wang Zong*

*Xiao v. Reno*, 837 F. Supp. 1506, 1545 (N.D. Cal. 1993) ("The Court's ruling as to

the eleven remaining claims was not disturbed by the Ninth Circuit's decision, and

consequently, it remains the law of the case.").  By granting Larson's First Claim,

in part, and denying with prejudice DC's First and Second Counterclaims, the 2013

judgment properly comported with the pleadings, the court's prior rulings, and

2011 judgment to the extent not reversed by *Larson I*.[19]

## B.    DC's Fourth Counterclaim Is Pled "In The Alternative" *If* the First Claim Is Granted

DC's vague argument that judgment on its Fourth Counterclaim rendered

judgment on Larson's First Claim "procedurally improper" (OP-61) is illogical.

---

[19] DC's argument that the judgment "does not track actual claims" (SB-63) is specious.  Larson's First Claim sought declaratory relief "so that the parties may know their respective rights and obligations with respect to the Termination and the copyright interests thereby recaptured[.]"  ER-3174¶55.

It's just the opposite.

DC's "Fourth Alternative Counterclaim" alleges—"In the event that the Superman Notices…are deemed effective…Plaintiffs[] have transferred or are contractually obligated to transfer to DC…all rights…in the Superman Works." ER-358, 1654, 1660.

In short, DC's "Fourth Alternative Counterclaim" only came into play if Larson's First Claim (Notices' validity) was *granted* and DC's First and Second Counterclaims (invalidity) were *denied*. ER-3173-74, 243-48.  The work-for-hire rulings under Section 304(c) were necessary to the First Claim.  ER-343-47.

DC pled "in the alternative" to evade *paying the Siegels* under its alleged October 19 settlement agreement if their Termination was invalidated.  Although its alleged settlement reflected litigation risks, DC sought to have its cake and eat it too.  Having made this tactical choice, DC cannot amend its counterclaims in appellate briefs.  *See Pirelli Armstrong Tire Corp. Retiree Med Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011) ("axiomatic rule that a plaintiff may not amend his complaint in his response brief").

## C.    The First Claim Is Not Mooted by DC's Fourth Counterclaim

DC's argument is wrong, both legally and pragmatically. The Fourth Counterclaim seeks a declaratory judgment that the Siegels, by the October 19 Letter, "transferred or are contractually obligated to transfer" their recaptured

Superman copyrights to DC.  ER-350.  This is not mutually exclusive of the First

Claim; on the contrary, it derives from it as shown above.  The district court's

detailed decisions in 2008, incorporated in its 2011 and 2013 judgments, resolved

numerous complex issues presented by the First Claim (and DC's First/Second

Counterclaims) regarding the Siegels' Termination, irrespective of DC's Fourth

Counterclaim.  ER-87-185, 186-271.  The court expended considerable resources

in extremely thorough published decisions—persuasive precedent on numerous

termination issues in an emerging area of copyright law.  *Id*.; OB-17 n.3

That the Siegels "would transfer" their recaptured copyrights does not moot

those property interests. This is true even if they had made an actual assignment.

Important legal rights flow from Jerome Siegel's original authorship/copyrights to

which Larson is the statutory successor.  *See Nimmer* §5.03.  For instance, if this

case is remanded as it should be for trial of the rescission and/or acquiescence

issues, and Larson prevails she would own her recaptured copyrights per the First

Claim judgment.  Alternatively, if DC later defaults on its October 19 obligations

(*e.g*., fixed fees, complex royalties, periodic accountings, credit, health insurance),

Larson would also have a rescission remedy whereupon her recaptured copyrights

per the judgment would revert.  *See Rano v. Sipa Press, In*c., 987 F.2d 580, 586

(9th Cir. 1993).  Clearly, DC wants to dispose of the First Claim precisely because

it is *not* moot.

In these events and others (e.g., new laws enhancing authors/heirs' rights), Larson and the courts should not have to spend years needlessly re-litigating the intricate underlying copyright issues. *See Disimone v. Browner*, 121 F.3d 1262, 1266-1267 (9th Cir. 1997) ("Where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.").

*Larson I's* passing comment does not alter this correct analysis. ER-277 (noting that as a judgment "would appear to render moot" other questions "we decline to address these other issues at this time."). It was not part of any adjudication of actual mootness on the merits, which the parties had no real opportunity to brief. It was also speculative because the judgment on remand had yet to be rendered and could take many forms as DC sought declaratory relief. ER-350-51. *See Trent v. Valley Elec. Ass'n, Inc.*, 195 F.3d 534, 537 (9th Cir. 1999)("Although the panel in *Trent II* stated that 'Trent's evidence would seem to compel a judgment in her favor,' this pre-evaluation is dicta and not a decision on the merits. Therefore, the panel's statement is not binding[.]").

The statement is more reasonably read as a declination to address "at this time" complex issues that *could be* mooted or otherwise affected by the trial court's judgment. As shown above, nothing about the actual judgment moots Larson's previously decided First Claim.

## III.  DC'S WORK-FOR-HIRE ARGUMENTS ARE MERITLESS

DC makes a slew of misleading conclusory arguments, unsupported by its record citations.  All were meticulously examined and rejected by the district court (Larson, J.).  ER-186-271.

### A.    *Action Comics, No. 1 ("AC#1")* Is Not Work-For-Hire

The court correctly denied DC's claim that random aspects of *AC#1* (sparse panels, colorization and cover-art *by Shuster*), converting it from a newspaper to magazine format, were works-for-hire.

### 1.    DC Is Precluded From Arguing That Bits of *AC#1* Are Works-For-Hire

The court rightly concluded that DC's "argument was made and rejected by the Second Circuit in the 1970s…and is thus precluded as a matter of collateral estoppel here."  ER-227.  *Siegel v. National Periodical Publications,* 508 F.2d 909, 914 (2d Cir. 1974) ("*Siegel*") held, based on an extensive record, that *AC#1* was not a work-for-hire under the "instance and expense" test:

> The court below held that Superman was also a 'work for hire'….*We disagree*….Superman and his miraculous powers were completely developed long before the employment relationship was instituted. *The record indicates that the revisions directed by the defendants were simply to accommodate Superman to a magazine format*..

*Id*. (emphasis added).  *See* ER-183-184 (DC submitted "the same [1973] evidence that defendants now seek to use in this case" regarding "the reformatting process").  On appeal, DC also relies on the same 1973 testimony.  SB-66.

DC's assertion that *Siegel* did not consider this issue is therefore untrue. *See Playboy Enters. v. Dumas* ("*Playboy*"), 53 F.3d 549, 554 (2d Cir. 1995) ("[I]n *Siegel,* we found that the comic strip character Superman was not a "work-for-hire" because although the creators revised and expanded the comic strip at the request of the publishers and were paid for that work, the Superman character was completely developed long before the employment relationship existed."); *Twentieth Century Fox Film Corp. v. Entm't Distributing,* 429 F.3d 869, 880 (9th Cir. 2005)(*Siegel* held "the Superman comic strip was not created at the employer's instance").

Nor was the Second Circuit's finding "dicta." SB-67. If DC owned *AC#1* as a work-for-hire, it could not have held that Siegel/Shuster owned *AC#1's* renewal copyright, but transferred it to DC in 1938. ER-2970-71

 "Once an issue is raised and determined, it is the entire issue that is precluded, not just the particular arguments raised in support of it in the first case." *Kamilche Co. v. United States*, 53 F.3d 1059, 1063 (9th Cir. 1995) (citations omitted). The Second Circuit considered the re-formatting additions and found *AC#1*, without exception, was <u>not</u> work-for-hire, precluding DC's arguments. *Id.* at 1062. "If a new legal theory or factual assertion raised in the second action is relevant…the prior determination…is conclusive on the issue." *Paulo v. Holder,* 669 F.3d 911, 918 (9th Cir. 2011); *see also Westinghouse Elec. Corp. v.*

60

*General Circuit Breaker & Elec. Supply, Inc.*, 106 F.3d 894, 901 (9th Cir. 1997)

("Necessary inferences from the judgment, pleadings, and evidence will be given

preclusive effect.").

       2.     <u>Alleged Additions to *AC#1* Were Not "Work-For-Hire"</u>

Regardless of *Siegel's* preclusive effect, DC failed to provide any admissible

evidence to sustain its burden as to any portion of *AC#1*.  The district court

independently concluded, after careful analysis of the record, that no part of *AC#1*

was "work-for-hire."  ER-226-232.

       a.    *Siegel/Shuster's 1938 Material*

Siegel/Shuster re-cut and added minor panels to their Superman strip "on

spec" to get their pre-existing work published.  ER-1960-61, 2767,¶¶32, 34; SER-

842; ER-2102-03.  DC purchased Siegel/Shuster's pre-existing thirteen-page strip

in the 1938 grant *after* it was re-formatted and accepted.  ER-2767,¶32; ER-2959;

ER-2967-68.

DC grossly mischaracterizes Siegel/Shuster's affidavits regarding the

reformatting process (SB-67) which clearly support that this was speculative work.

SER-842; ER-2102-03,2959,2967-68,2972.  DC provided mere format

specifications.  SER-842.

DC misleadingly refers to a "1937 employment agreement" (SB-66), but that

concerned Slam Bradley/The Spy, <u>not</u> Superman.  ER-2050-51.  DC falsely recites

work by "DC's artists" (SB-65), when Shuster created the artwork.  ER-155.  And as Siegel testified the minor panels Shuster added to satisfy the magazine format "illustrated the story continuity [Siegel] had already written."  ER-2104.

### b.  *Colorization*

DC again failed to meet its burden.  The court rejected DC's colorization argument in a detailed analysis.  ER-229-231.  DC asserted without any admissible evidence that it chose Superman's *AC#1* colors, solely relying (SB-61-62) on the declaration of its long-time manager Jack Adler (90), which the court properly discounted as pure-hearsay.  ER-230-232.  Evidence suggested that Siegel/Shuster unsurprisingly provided "color guides" for their pet project.  RER-7; ER-230.  DC attacks the straw man that the court found colors non-copyrightable (SB-64, citing-ER-229-230), when this nowhere appears at ER-229-230 or otherwise.

### c.  *Cover Art*

DC's argument that "DC staff artists" "create[d]" *AC#1's* cover ("Cover") is equally false and unsupported.  SB-65.  Siegel's memoir (relied on by DC) confirms that Shuster's pre-existing "promotional panel-drawing" *was* the Cover.  SER-968 ("large promotional panel-drawings had several years earlier been prepared by Joe…Sullivan selected one for the…cover").

DC *solely* cites to Sullivan's letter (SB-65), referring to this panel-drawing.  ER-232, 1871-72.  But DC argues, without evidence, that it used an interior-panel

(also by Shuster) "as a template."  SB-65.[20]  This leads nowhere as a comparison with the Cover reveals trivial un-copyrightable differences—things which also exist in Shuster's pre-existing *AC#1* panels.

The black and white *copy* of *AC#1's* Cover in the Ads is not "work for hire" for the same reasons the Cover and the rest of *AC#1* is not. ER-1502-04; SER-682-91.

### d.    *DC Is Not a Joint-Author*

Finally, even if DC could prove (though it failed) that reformatting additions to *AC#1* were work-for-hire *and* copyrightable, none of this rises to the level of joint authorship.  SB-63-64.  As this Court held in *Aalmuhammed,* the "authorship [] required under the statutory definition of a joint work…is not the same thing as making a valuable and copyrightable contribution" and "contribution of independently copyrightable material to a work….will not suffice to establish authorship of a joint work." 202 F.3d at 1232-1233 (writer of movie scenes was not a joint author).  *AC#1's* first page states its well-known authorship— "Superman: Jerome Siegel & Joseph Shuster."  ER-259.

### B.    *AC#4* and *Superman#1* Are Not Works-For-Hire

The district court correctly found that *AC#4* and pages 3-6 of *Superman#1*,

---

[20] DC misleadingly states, without citation, that DC created the Cover "after hiring Shuster" (SB-65) when Shuster was not engaged to create Superman material until September 22, 1938.  ER-2054-56.

were not works-for-hire because they were created in 1934-35.  ER-125.

### 1.    *Superman#1*

The record demonstrated that Siegel's 1935 scripts were published in *Superman#1*.  ER-1963-65,1975,2242-45; ER-124-25.  DC contradicted the "Foreward" in <u>DC's</u> reprint *of Superman#1*.  ER-92.  The court debunked DC's mischaracterizations of Siegel's memoir (ER-124-25) and DC's letter (ER-2210) and properly concluded that DC failed to meet its burden.  ER-125.  DC improperly relies on an inadmissible (and incomplete) *extra-record* page it failed to submit below.  SB-69.

### 2.    *AC#4*

DC does not contest that Siegel's 1934 script published in *AC#4* was not work-for-hire.  DC's claim (without citation) that "DC's staff artists" illustrated *AC#4* is false; Shuster did.  ER-123.  It is also irrelevant.  Larson recaptured *Siegel's* joint-authorship interest—an "undivided [50%] ownership in the entire work."  *Nimmer,* §6.03.

### C.    Larson Recaptured the First Two-Weeks of Newspaper Strips Created "On Spec"

#### 1.    <u>Not Work-For-Hire</u>

The district court correctly found that the first two-weeks of "Superman" newspaper strips ("Spec-Strips") were *not* works-for-hire because they "were not created at the instance of either [DC] or McClure."  ER-153-58.  Siegel/Shuster

were not engaged to produce the Spec-Strips (ER-2055, 2058); Siegel wrote the Spec-Strips without DC's involvement (ER-2064; 2761-64); Shuster illustrated the strips before McClure bought them (ER-2064-65, 2074-79); Siegel submitted them to different syndicators (ER-2071).

DC misrepresents, "[t]he Strips were created pursuant to 1937 employment agreement" (SB-67), when this agreement pertained to *Slam Bradley*/*The Spy*, and merely gave DC "first refusal" *to purchase* new material.  ER-2968.

DC argues that ownership of underlying Superman rights transforms the Spec-Strips into works-for-hire.[21] This is contrary to controlling precedent which recognizes that (under the 1909 Act) "aspects of a derivative work added by the derivative author are that author's property."  *Stewart*, 495 U.S. at 223.  "[T]here is [also] nothing in the Copyright Act requiring the author of a derivative work to obtain permission to copyright his work from the owner of the …underlying work."  *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 523 (7th Cir. 2009). "Were the Court to adopt defendants' approach every derivative work would also be considered a work made for hire."  ER-3687-88.

DC misleadingly states it "compensate[ed] Siegel and Shuster" (SB-68)

---

[21] Nothing in either *Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc.,* 342 F.3d 149 (2d Cir. 2003) or *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213 (2d Cir. 1972), cited by DC, remotely supports the erroneous proposition that ownership of underlying work makes "derivative work a work-for-hire." SB-67.

when they were not even paid for their Spec-Strips. ER-258-60. Under their

September 1938 McClure agreement, they were solely entitled to a percentage of

"net profits," if any. *Id*. This weighs heavily against work-for-hire as

Siegel/Shuster bore all costs of creation. ER-2032, 2049-52, 2055, 2148-49, 2175-

203, 2245, 2269-70. *See Nimmer*, §5.03[B][2][d].

### 2.    DC Was Clearly On Notice

As the district court correctly found (ER-171-77), any failure to specifically

list the Spec-Strips in the Siegels' termination notice was "harmless error" under

37 C.F.R. §201.10(e)("Harmless errors in a notice…shall not render the notice

invalid."). *See* 74 F.R. 12554-01, 12555; ER-167-77, 234-35. The obvious intent

is to avoid invalidating terminations based on inadvertent mistakes where, as here,

the terminated party had actual or constructive notice. *See Music Sales Corp. v.

Morris*, 73 F. Supp.2d 364, 378 (S.D.N.Y. 1999) (finding notice of termination

although "generic statement would not seem to reasonably identify the grant").

DC cannot seriously claim that it did not have notice of the Siegels' intent to

terminate the few Spec-Strips inadvertently omitted from their notice, which listed

*hundreds* of these newspaper strips. ER 205:6-9. The Siegels unambiguously

provided notice of their intent to terminate *all* grants of copyright as to *every*

Superman work; and stated "if any such work has been omitted, such omission is

unintentional and involuntary." ER-2833, 2843, 2853, 2863. The court correctly

noted that "any recipient of the termination notice would quickly understand that the plaintiffs have sought to reclaim the copyright in any and all Superman works ever created." ER 131.[22]

## CONCLUSION

For the foregoing reasons, the district court's orders and judgment as to DC's Fourth Counterclaim in both cases should be reversed, and DC's Cross-Appeal denied.  The Court should grant partial judgment that there was no present assignment of the Siegels' recaptured copyrights in the October 19 Letter; that per Section 304(c)(6)(D) it had no effect on their 2002 and 2012 termination notices, and accordingly, reverse the dismissal of the Superboy case.  The Court should remand for trial of the rescission and acquiescence issues in the Superman case (04-cv-8400), and for adjudication of the Superboy case (04-cv-8776).

Dated:  July 18, 2014                TOBEROFF & ASSOCIATES, P.C.

                                     _____/s/ Marc Toberoff_____
                                        Marc Toberoff
                                     Attorneys for Appellant, Laura Siegel
                                     Larson, individually and as personal
                                     representative of the Estate of Joanne
                                     Siegel

---

[22] DC misrelies on *Burroughs*, 683 F.2d at 618, 622 which did not concern §201.10(e)'s "harmless error" rule.  The Burroughs notice (1) *intentionally* omitted five Tarzan titles (ER-176:3-18, 172-176; RER-2-3); and (2) did not, as here, state an intent to terminate *all works*. *Burroughs v. MGM*, 491 F.Supp.1320, 1322 (S.D.N.Y. 1980).

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief is accompanied by an unopposed motion for leave to file an oversize brief pursuant to Fed. R. App. P. 27, 28.1, and 32 and Circuit Rules 27-1 and 32-2 and is 14,998 words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Dated:  July 18, 2014                TOBEROFF & ASSOCIATES, P.C.

                                        _____/s/ Marc Toberoff_____
                                        Marc Toberoff

                                        Attorneys for Appellant, Laura Siegel
                                        Larson, individually and as personal
                                        representative of the Estate of Joanne
                                        Siegel

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing with the Clerk of the Court for the

United States Court of Appeals for the Ninth Circuit by using the appellate

CM/ECF system on July 18, 2014, and that all participants in the case are

registered CM/ECF users.


Dated:  July 18, 2014          TOBEROFF & ASSOCIATES, P.C.

                               _/s/ Tim Lamoureux____
                                 Tim Lamoureux

                               Attorneys for Appellant, Laura Siegel Larson,
                               individually and as personal representative of
                               the Estate of Joanne Siegel